**KANSAS HEALTH CARE ASSOCIATION, INC., et al., Plaintiffs,**

**v.**

**KANSAS DEPARTMENT OF SOCIAL AND REHABILITATION SERVICES and Donna Whiteman, Defendants.**

**No. 93–4045–RDR.**

United States District Court, D. Kansas.

May 11, 1993.

Randall J. Forbes, Kevin M. Fowler, John C. Frieden, Frieden, Haynes & Forbes, Topeka, KS, for plaintiffs.

Robert F. Bennett, James R. Orr, Patrick D. Gaston, Patricia A. Bennett, Bennett, Lytle, Wetzler, Winn & Martin, Prairie Village, KS, Bruce A. Roby, Kansas Dept. of SRS, Topeka, KS, for defendants.

### MEMORANDUM AND ORDER

ROGERS, District Judge.

Plaintiffs claim that their rights under federal law, specifically the Medicaid program, 42 U.S.C. § 1396 *et seq.*, have been violated by defendants and, therefore, injunctive or declaratory relief is appropriate under 42 U.S.C. § 1983. Section 1983 guarantees the rights of persons under federal law from violation by persons acting under color of state law. This case is now before the court upon plaintiffs' motion for a preliminary injunction. Defendants have filed a motion to dismiss which is primarily directed against plaintiffs' request for an injunction. After conducting a hearing and considering the pleadings of both sides, the court shall grant plaintiffs' request for injunctive relief under the terms and conditions discussed at the end of this order. Many issues have been raised by the motions before the court. These issues shall be discussed in the context of the following enumerated findings of fact and conclusions of law.

*The parties and relief requested*

1. Plaintiffs are five corporations and a trade association. The five corporations operate six nursing homes in Kansas. The trade association represents approximately half of the estimated 400 nursing homes in the state. Defendants are the state agency (the Department of Social and Rehabilitation Services) in charge of administering reimbursement of nursing homes participating in the Medicaid program and the officer in charge of the agency, the Secretary of the Department of Social and Rehabilitation Services, Donna Whiteman.

2. Plaintiffs seek a preliminary injunction directing defendants to modify or suspend the current Medicaid reimbursement rates for plaintiffs on the grounds that defendants have failed to comply, for procedural and substantive reasons, with the Medicaid law, specifically what is called the Boren Amendment.

*Consolidation under FED.R.CIV.P. 65(a)(2)*

3. The court has raised the question of whether the hearing upon plaintiffs' motion should be consolidated with the trial on the merits. Although the court suspects consolidation would better serve the goals of an "efficiently and economically operated" court, and the court is skeptical of the benefits of additional hearings or discovery regarding most of the issues discussed in this order, the court shall not order consolidation because

neither side was given sufficient definite notice in advance that the hearing in this matter would be consolidated with the trial on the merits. See *Warehouse Groceries Management, Inc. v. Sav–U–Warehouse Groceries, Inc.*, 624 F.2d 655 (5th Cir.1980).

*Abstention*

■ 4. Defendants have argued that the court should abstain from hearing this case on the grounds explained in *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). There, the Court held that it was proper for a federal court to abstain from deciding a case when federal review would likely be "disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 814, 96 S.Ct. 1236, 1245, 47 L.Ed.2d 483 (1976). In *Burford*, the Court decided that a lower federal court ruling regarding the reasonableness of an oil well permit would have unduly interfered with an elaborate state system designed to consider the same issue under state policy. Keeping in mind that abstention should be a narrowly applied doctrine, *id.* at 813, 96 S.Ct. at 1244, we do not consider abstention appropriate in this case. As part of the Medicaid law, defendants must establish "an appeals or exception procedure that allows individual providers an opportunity to submit additional evidence and receive prompt administrative review, with respect to such issues as the agency determines appropriate, of payment rates." 42 C.F.R. § 447.253(e). It appears to the court that the appeals or exceptions procedure established by defendants is intended to deal with cases involving unusual or extraordinary circumstances. See administrative decisions attached as Exhibits E and F to Affidavit of James A. Klausman, Docket No. 33. The arguments made in the case at bar concern ordinary circumstances facing all nursing homes. Under the state appeals procedure, challenges to the facial validity of an agency rule or regulation are expressly exempted from review. K.S.A. 75–3306(h). The challenges plaintiffs make in this case could be construed as falling within this prohibition. In sum, we do not believe plaintiffs' claims fall within the ambit of the state administrative appeals or exceptions process. But even if agency review was possible, there has been no evidence that a decision by this court in this case would unduly disrupt the state system. Accordingly, we do not believe abstention is proper in this case. Contrast, *Bethphage Lutheran Service, Inc. v. Weicker*, 965 F.2d 1239, 1247 (2d Cir.1992) (abstention approved in Medicaid case brought by a single provider that did not make "systemic challenges to the rate-setting methodology.").

*Class certification*

■ 5. Defendants have argued that no decision should be made upon plaintiffs' motion until a decision concerning class certification is made. Plaintiffs have made allegations preliminary to class certification but have not formally moved for class certification. At this point, we do not believe class certification is necessary. "If a State errs in finding that its rates are reasonable and adequate ... then a provider is entitled to have the court invalidate the current state plan and order the State to promulgate a new plan that complies with the Act." *Wilder v. Virginia Hospital Association*, 496 U.S. 498, 520, n. 18, 110 S.Ct. 2510, 2523, n. 18, 110 L.Ed.2d 455 (1990). The invalidation of the state reimbursement plan in this case will affect the interests of all the potential class members, regardless of whether a class is formally certified. We have no reason to doubt that defendants would apply any changes made to the reimbursement formula uniformly to nursing homes in Kansas. Therefore, we find consideration of class certification unnecessary at this time. See 7B Wright, Miller & Kane, FEDERAL PRACTICE & PROCEDURE § 1785.2 (1986); see also, *Lapeer County Medical Care Facility v. State of Michigan*, 765 F.Supp. 1291, 1302 (W.D.Mich.1991) (precertification treatment of a similar action as a class action for purposes of a preliminary injunction).

*The Medicaid program and the Boren Amendment*

■ 6. The State of Kansas has volunteered to participate in the Medicaid program. Under the Medicaid program, the

federal government shares in the costs of hospital, nursing home, and other care for persons who cannot afford such care. If a state chooses to participate in the Medicaid program, and thereby receives federal funds, the state must abide by the legal conditions of the program. When the Medicaid program started, this meant that the state had to reimburse care providers for their reasonable costs of serving Medicaid clients. In 1980, to provide states more flexibility in setting reimbursement rates and to discourage inflation, Congress passed the Boren Amendment. Under the Boren Amendment, states are obliged to establish a plan for payment "which the State finds, and makes assurances satisfactory to the Secretary [of Health and Human Services], are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards ..." 42 U.S.C. § 1396a(a)(13)(A).

7. Compliance with the Boren Amendment has procedural and substantive aspects. Procedurally, a state must make findings and assurances of conformity with the Boren Amendment at least annually and every time a substantial change is made in the state's plan of reimbursement. Findings and assurances are two different things for the purposes of the law. As the Tenth Circuit indicated in *AMISUB (PSL), Inc. v. Colorado Dept. of Social Services*, 879 F.2d 789, 796 (10th Cir.1989) *cert. denied*, 496 U.S. 935, 110 S.Ct. 3212, 110 L.Ed.2d 660 (1990), findings precede assurances; findings constitute the reasoning process which substantiates the assurances which must be made to the Health Care Financing Administration (HCFA), an agency of the Department of Health and Human Services. Unlike the assurances, findings are not reviewed by HCFA. *Id.* at 795.

8. In *AMISUB*, the Tenth Circuit stated that the law required *"at a minimum"* that the findings identify "efficiently and economically operated" facilities; the costs which must be incurred by the facilities; and "payment rates which are reasonable and ade-

quate to meet the reasonable costs" of the facilities. *Id.* at 796. The Circuit further stated that states were "free" to create their own method for arriving at the required findings, but a bona fide finding process must occur before the assurances of compliance are made to HCFA. *Id.* at 797. The Ninth Circuit has also commented upon the flexibility states have in making findings:

[T]he finding process does not require any special studies or written findings. It is sufficient if the state agency has considered, on the basis of some reasonably principled analysis, whether its payments rates meet the substantive requirements of the Boren Amendment.

*Folden v. Washington Dept. of Social and Health Services*, 981 F.2d 1054, 1057 (9th Cir.1992).

9. The substantive requirement of the Boren Amendment is that reimbursement rates be established which meet the costs which efficiently and economically operated providers must incur to dispense care in conformity with state and federal laws and regulations. There is no precise rate requirement. The reimbursement rate is judged by whether it falls within a range of reasonableness. *Id.* at 1058. There is also no requirement that particular costs or inflation factors be specifically accounted for or that a specific percentage of providers be fully reimbursed for their costs. *Folden v. Washington Dept. of Social and Health Services*, 744 F.Supp. 1507, 1529–30 (W.D.Wash. 1990) *aff'd*, 981 F.2d 1054 (9th Cir.1992). The entire reimbursement rate is of primary relevance, not the individual components of the rate. *Id.* at 1535 (citing, *Colorado Health Care Ass'n v. Colorado Dept. of Social Services*, 842 F.2d 1158, 1167 (10th Cir. 1988)).

*Standard of review*

10. Our job is to determine whether there is a reasonable factual basis to support defendants' findings and assurances that, under the Medicaid plan, efficiently and economically operated nursing homes are reasonably and adequately reimbursed for the costs they must incur. *AMISUB*, supra, 879 F.2d at 800. The state's determination of compliance with the Boren Amendment is not entitled to

the deference afforded a federal agency. *Id.* at 795–96. To the court's knowledge, the assurances delivered by defendants to HCFA have not been formally approved or disapproved by the federal agency. Nevertheless, deference is owed to the expertise and experience of defendants. "There is a presumption that a state will engage in a bona fide finding process before it makes assurances to HCFA ..." *Id.* at 797. This presumption, however, does not shield the Medicaid plan from thorough, probing consideration in deciding whether a reasonable factual basis exists to support defendants' findings and assurances of compliance with federal law. *Id.* at 800. Plaintiffs have the burden of proving their factual claims by a preponderance of the evidence. *Multicare Medical Center v. State of Washington,* 768 F.Supp. 1349, 1389 (W.D.Wash.1991).

*The Kansas Medicaid payment plan*

11. In Kansas, a new Medicaid payment plan or reimbursement rate is established each year on July 1. The plan at issue in this case, which has been labeled "TN 92–22," took effect July 1, 1992 and will expire on June 30, 1993, although some nursing homes may receive reimbursement after June 30 on the basis of the current rate for costs incurred prior to June 30.

12. For several years, Kansas has employed a similar methodology for reimbursing nursing homes for the costs of caring for people eligible for Medicaid. Kansas has a facility-specific prospective rate system. In other words, Kansas predicts what rate will properly reimburse each nursing home in the Medicaid program for the Medicaid costs the home will incur in the oncoming year. Each home has a different rate which is based largely on that home's historical costs.

13. Kansas first looks at the most recent annual cost reports of each nursing home. These reports are subject to desk review and field audit. Adjustments are made to penalize homes which have not achieved an 85% occupancy rate. Also, limits upon reimbursement of owners and administrators are applied.

14. Part of each nursing home's allowed costs are then inflated to account for "historical inflation." This is inflation which has occurred since the costs reported were incurred. Kansas uses the all-urban consumer price index (CPI) to account for this inflation. The historical inflation rate is not applied to salaries and other costs amounting to 70% or 80% of a nursing home's costs. More of each home's allowed costs are also inflated to account for "future inflation." For the current reimbursement rate, the future inflation period stemmed from the month of the most recent CPI (i.e., May 31, 1992) forward to the beginning of the rate-paying period (i.e., July 1, 1992). This is one month's time. An inflation index focusing upon the costs of nursing homes (referred to as the "DRI index" in this case) is applied to this period. The future inflation rate applies to a much larger percentage of nursing home costs than the historical inflation rate because it is applied to employee salaries and payroll taxes. It is not applied to administrator salaries, owner compensation, interest expenses and other taxes.

15. The inflation factor was changed in the current reimbursement rate in two ways. Previously, the CPI was used instead of the DRI index to estimate a future inflation rate. In addition, the inflation rate was applied out to the middle of the rate-paying year instead of to the beginning of the rate-paying year. This change reduced reimbursement to nursing homes serving persons eligible for Medicaid benefits from what would have been paid if the prior year's formula had been used.

16. The costs of each home, adjusted for inflation, are divided into four cost centers (administrative, room and board, health care, and plant operating). The costs of each home in each cost center are then arrayed. The State derives cost limits for each cost center from the arrays. The cost limits are determined by applying percentiles to the array of cost center costs. Reimbursement of administrative costs, for example, is limited to the costs of the home at the 75th percentile of the array. The cost limits for the other cost centers are established at levels incurred by homes at a higher percentile: room and board—90%; health care—90%; and plant operating—85%. The adjusted costs of each home are then compared against the cost limits. However, if an indi-

vidual home's administrative costs adjusted for inflation are below the administrative cost limit, the home's reimbursement rate will be based on the home's actual costs plus inflation instead of the cost limit. Under this system, a nursing home's actual costs could be below the cost limits in each cost center, but the home might not be fully reimbursed for the costs it actually incurred during the rate year, if the home's actual Medicaid costs exceeded the costs incurred by the home in the last cost report as adjusted for inflation. Underreimbursement is the actual result if any shortfall in reimbursement is not compensated for by incremental funding for an efficiency incentive and for real property costs.

17. An incentive factor for efficiency is calculated and a fee for certain real and personal property expenses is added to determine the final reimbursement rate for each facility. The incentive factor is a per diem add-on ranging from zero to fifty cents. It is based upon administrative costs and plant operating costs minus real and personal property taxes. Providers with the lowest 30% of such costs receive a $.50 incentive factor. Providers with the highest 25% of such costs receive no incentive factor. Incentive factors of $.40 and $.30 are given to providers between the 30% and 75% range of costs. The real and personal property fee (RPPF) is intended to reimburse for depreciation, mortgage interest, and lease expense and amortization of lease expenses. The ownership costs for the fee are based upon 1983 or 1984 cost reports. An 85% occupancy rule is applied to the costs, and reimbursement varies according to how a home compares to a graduated scale of costs of other nursing homes. No updating of the costs or provision for inflation has been conducted. Even when ownership of a nursing home changes, the RPPF for the home is not modified. Under the current system, about half of all nursing homes in the Medicaid program have their actual ownership costs fully reimbursed by the RPPF.[1]

18. Because this is a prospective rate-setting system, there is no final settlement at the end of the year. If a home's costs are less than the established rate, the nursing home can keep the difference. On the other hand, if a facility's costs exceed the rate, the facility must absorb the difference.

*Compliance with the Boren Amendment*

19. There is no documentation which explains why a change was made in the inflation factor for the current reimbursement rate. There was "considerable discussion ... around the general rate setting processes for nursing facilities including historical and prospective inflation factors." Ex. 9 at p. 1315. There were no specific studies or analyses done to determine the impact of the change in the inflation factor or whether the reimbursement rates would ultimately satisfy the substantive requirements of the Boren Amendment. Secretary Whiteman testified that she discussed the rate formula with a group of people including representatives of the accounting agency (Myers and Stauffer) which contracts to assist the State with administration of the reimbursement program. She considered: the average per diem rate; what other states' rates were; the historical increase in the amount of Medicaid reimbursement for nursing homes in Kansas; a comparison with Medicare reimbursement principles; the financial health of the nursing home industry; the quality of nursing home care in Kansas; and the budgetary limits on what could be spent. The court shall examine these factors as well as others which have been offered as findings or rationale in support of the current reimbursement formula.

20. Of course, Kansas employs a facility-specific system of reimbursement which is based on each home's actual costs during a prior time period. It does not appear that considering the average per diem rate would provide significant useful information, particularly as to the effect of future inflation upon the previous cost experience of individual efficient and economical homes.

---

1. This is a rough estimate. In a document prepared by defendants, it was stated that the RPPF "is less than the actual ownership costs reported by the majority of providers." Ex. 9 at p. 1267. However, in an analysis of 276 facilities reported by defendants in pleadings prepared after the hearing in this case, it was concluded that 56% of the homes were reimbursed for more than 100% of their ownership costs in calendar year 1992. Docket No. 30 at p. 13.

21. Comparisons of the Kansas rate with the rates of other states are also of limited relevance. Other states have different sets of allowed costs. They have different reimbursement formulas. The data may also come from different time periods. Nor do such comparisons offer insight as to the accuracy of a specific inflation factor. However, if such a comparison is made, it appears from the evidence submitted to this court that Kansas would rank at the bottom or next to the bottom of the list of states surveyed.

22. Secretary Whiteman testified that Medicaid reimbursement to nursing homes has increased by $50 million over a three-year period and that this was one of the factors she considered in determining the current reimbursement rate. Other measures of the gross increase in reimbursement have also been mentioned in the evidence. Again, this does not address inflation faced by individual nursing homes since the cost reporting period. Instead it reflects cost increases in the industry during or prior to the cost reporting period. Nor is there any indication that a part of the increased reimbursement was considered a windfall to nursing homes which should compensate the homes for a reduction in the inflation factor. Contrary to any suggestion of a windfall, the evidence during the hearing in this case established that the costs of care have increased and the legal requirements for the level of care have increased in recent years. The evidence further suggested that reimbursement has not kept pace with necessary costs.

23. The law governing reimbursement under the Medicare program permits a more liberal reimbursement regime. The Medicaid law and regulations require that compensation under the Medicaid program not exceed the amount which would be paid under Medicare principles. This is called the Medicare "upper limits" test. Secretary Whiteman stated she was impressed that the current reimbursement rate was within one dollar of the rate figured under Medicare reimbursement principles. Once again, this does not address the inflation factor specifically. No specific analysis of the change in the inflation factor was made before the change

was made. Nor does the upper limits test, as calculated, consider specific reimbursement rates for individual homes. Instead, it looks at the average per diem rate. Furthermore, the court is persuaded by the testimony of plaintiff's expert that there are numerous ways to calculate the "Medicare rate" and that a more accurate analysis of the Medicare rate might produce a rate nine dollars greater than the per diem rate for the current year.

24. There is no evidence that nursing homes in Kansas on the whole have a high rate of bankruptcy or closures because of financial difficulties. However, we are unaware of any evidence or analysis considered by defendants which suggested that the Kansas nursing homes were being so generously reimbursed for their Medicaid residents that the change in the inflation factor could be made without violating the Boren Amendment. The evidence before the court indicates that by and large, nursing homes cover shortfalls in reimbursement of Medicaid costs by charging higher prices for private pay patients. This is possible in part because, on the average, private patients make up almost 50% of the Kansas nursing home census, a high percentage compared with other states in the nation. Nursing homes may also make money from other investments or receive inputs from charitable or other outside sources.

25. Secretary Whiteman also stated that she considered the number of decertifications and deficiency findings in Kansas nursing homes. Studies have been done *since* the current rate was set to examine any correlation between reimbursement rates and quality of care. No correlation has been discovered. But, so far, the studies are inconclusive. No witness testified that the studies were anything other than a first step toward examining the relationship between reimbursement rates and quality of care. Furthermore, the consideration of this factor ignores cost-shifting efforts, (e.g., increasing rates paid by private patients) which might be used to maintain quality of care in spite of inadequate reimbursement rates. It also ignores the possibility that providers may be willing to suffer a loss of money, rather than

reduce the quality of care, and thereby risk decertification, loss of business reputation, and harm to residents.

26. Obviously, budgetary factors were a consideration and most likely the primary consideration in deciding to change the inflation factor. In the public notice announcing the change, it was estimated that the change would save $10.6 million or approximately $26,500 per nursing home. Secretary Whiteman considered that the appropriation approved by the Legislature was 3.6% less than what was originally anticipated by her agency to meet its funding needs.

27. It has been suggested that nursing homes benefit from having advanced knowledge of a reimbursement rate. But, there has been no evidence of an objective finding that efficient and economical nursing homes are able to control costs in spite of inflation or that productivity gains outstripping inflation are available to efficient and economical facilities. Indeed, as will be discussed later, the evidence indicates that about 90% of nursing homes have not been able to control their costs so that they are fully reimbursed for their necessary costs under the current reimbursement rate.

28. It has also been noted that Kansas suffers from an "overbedding" situation (i.e., a high number of nursing home residents per capita) and that there are several applications outstanding to operate additional nursing home space. However, this may be attributed to the profit potential from private patients in Kansas as well as the preference of Kansans to utilize nursing homes apart from alternative forms of care. It does not substantiate compliance with the Boren Amendment standard for reimbursement. See *Illinois Health Care Ass'n v. Bradley*, 983 F.2d 1460, 1467 (7th Cir.1993) ("Profitability alone is not a gauge to the adequacy of a state's medicaid reimbursement rate, nor an excuse for noncompliance with the [Boren] Amendment's procedural requirements."). Furthermore, a nursing home operating within the cost limits in Kansas could conceivably receive a reimbursement rate of $68.44, even though the average per diem rate this year is $50.99. It is possible that

potential operators of new nursing homes, who may feel unrestrained by previous cost reports, see an opportunity for profitable operation even with the Kansas Medicaid rates. For these reasons, overbedding and applications for additional bedding do not support a finding of the adequacy of the current reimbursement rate; nor does the evidence show that the Secretary considered these factors before changing the reimbursement formula.

29. Secretary Whiteman testified that her staff told her the DRI inflation rate was the best inflation index to apply to the period of future inflation. The expert witnesses in this case have concurred that the DRI index is a more accurate indicator of inflation in the nursing home industry than the CPI. The DRI annual inflation rate was 5.2% when the current reimbursement rate was calculated. This rate was applied for one month to inflate the actual allowable costs of individual nursing homes to the beginning point of the rate-paying period.[2] Defendants projected the costs which needed to be reimbursed under the Boren Amendment from July 1, 1992 to June 30, 1993 on the basis of the actual allowable costs incurred by the individual homes from January 1, 1991 through December 31, 1991 with a historical inflation rate (the CPI) applied to 20% to 30% of the costs from July 1, 1991 to May 31, 1992 and a future inflation rate (the DRI) applied to those costs plus employee salaries from June 1, 1992 to June 30, 1992. The bottom line, as described by plaintiff's expert, is that the actual allowable costs of individual nursing homes in the current rate-paying year were forecasted to be the actual allowable costs of the homes in 1991 plus 1% for inflation.

30. The court is unaware of any information available to defendants which estimated inflation for the relevant time period at 1%. Both the CPI and the DRI projected higher annual rates of inflation. As it has turned out, the DRI index indicates that nursing home costs have inflated at a rate of 3.35% in the first nine months of the current rate-paying year. Affidavit of Dr. Robert Deane, Exhibit A to Docket No. 33.

---

2. Actually, the rate was divided by twelve and rounded down to a figure of .4%.

31. Nor is the court aware of any specific factor involved in the reimbursement formula which defendants determined would compensate or counterbalance the decision to estimate inflation at a rate below any index which has been mentioned to the court and certainly below recent experience. While experience in the field of rate-setting and general knowledge of reimbursement issues as they relate to nursing homes may provide a reason or a "finding" to substantiate the assurances owed to HCFA, defendants have not demonstrated how such experience or knowledge led them to decide that the inflation factor should be lowered to 1%.

32. Retrospective analyses, which admittedly were not and could not have been available to defendants at the time the rate-setting formula was established for the current year, suggest that the inflation methodology employed by defendants is not offset by other reimbursement factors. A study of the 1992 cost reports of 91 nursing homes in Kansas (approximately 25% of all nursing facilities participating in the Medicaid program in Kansas), demonstrated that 91% or 83 out of 91 homes were not reimbursed for the "allowable" costs they incurred in the first six months of the current rate-paying period. Ex. 27. The loss for this period was $1.9 million. It could be assumed that the loss would be greater in the second half of the rate-paying year since more inflation would be suffered in that period. If the total annual loss for approximately 25% of participating facilities is $4 million, then underreimbursement for all the homes in the Medicaid program could be projected to $16 million.[3] This study assumed a 1.8% reduction in costs listed on the cost report as the average reduction made in the desk review and field audit process. However, it appears that the majority of facilities in Kansas have no adjustment made in their cost reports as a result of the desk review and field audit process. The study did not take into account the RPPF or property costs. Because the RPPF for some homes exceeds the property costs of those facilities, this factor could compensate for underreimbursement in other areas. However, as noted earlier, roughly 50% of nursing facilities do not have their property costs fully reimbursed by the RPPF. Moreover, another study of the 91 homes, which accounts for the RPPF and property costs, but does not make the 1.8% estimated review and audit reduction, determined that 82 out of 91 homes were not reimbursed their actual costs for the calendar year 1992.

33. Defendants presented an analysis of what the six plaintiff nursing homes would gain if, when figuring the reimbursement rate, the DRI was applied to the midpoint of the cost-paying year. The amount for the six nursing homes was $89,474.00. Defendants also demonstrated that one of the plaintiff nursing homes is being overreimbursed for Medicaid costs in the first six months of the rate-paying year. The other five fall within a range of reimbursement of 89.77% to 97.49%.

34. Defendants suggest that the figures in plaintiff's study of the cost reports from 91 homes may underrepresent the reimbursement of true Medicaid costs because of reimbursement permitted for reserve days and private rooms. Reserve days are days for which a nursing facility receives some reimbursement for a resident who is gone temporarily from the facility because of a hospital or home visit. Private rooms may not be filled with Medicaid clients and may be more expensive than other rooms in a nursing home. Nevertheless, the costs associated with the private rooms are part of the costs reported and allowed on a cost report.

35. The significance of these factors is only speculative. Furthermore, there is no evidence that these are factors which defendants relied upon in making the decision to reduce the inflation factor applied in the reimbursement formula.

36. There has been testimony from one of defendants' expert witnesses that "efficiency" could be so narrowly defined that only a small percentage of nursing homes in Kansas could possibly be operating efficiently. The witness stated that efficiency could be considered to have three components: technical efficiency, economic efficiency and productive efficiency. Without all three components a

---

**3.** The 91 homes were not selected scientifically to assure an accurate sample. However, there is no evidence that the sample was skewed to favor either side in this case.

nursing facility could be considered ineffi-cient. However, it appears that only a hand-ful of facilities in Kansas have sufficient beds to meet the criteria for productive efficiency suggested by the witness. There is no evi-dence that Kansas employs this definition of efficiency or that Congress intended the term be so defined when it passed the Boren Amendment. Nor has either side advocated such an approach.

37. Defendants also presented data from unreviewed and unaudited cost reports of 277 homes for the 1992 calendar year which show a reimbursement rate of 94% for homes in the lower cost quartile and 84% for homes in the higher cost quartile, for the first six months of the rate-paying year. Defendants contend this indicates an overall high per-centage of reimbursement which should sat-isfy the Boren Amendment. However, this data was not considered when the rate was set. In other words, it was not a finding which substantiated the assurances of the defendants to HCFA. More importantly, the data demonstrates a consistent and signifi-cant shortfall in reimbursement, which re-buts any "bottom line" analysis attempted by defendants.

38. The gaps in reimbursement for nurs-ing homes may be relatively small in compar-ison to the overall size of the program. It is also true that the shortfalls may not grow bigger each year because the annual rebas-ing of costs belatedly accounts for inflation and increased care requirements. In our opinion, however, this is not a reasoned basis for deciding that the actual allowable costs a nursing home must incur this fiscal year will be the same costs necessarily incurred in 1991 plus 1%, particularly when other factors have not been identified in defendants' find-ings process which compensate for the re-duced inflation factor.

39. It is undisputed that the change in the inflation factor was a substantial change in the reimbursement system which required findings and assurances to HCFA.

40. In the terms of the findings process suggested by the Tenth Circuit in *AMISUB*, defendants have implicitly identified efficient and economical providers of nursing home care through the establishment of the cost

center limits. In 1991, there were 263 facili-ties with all cost centers below limits. Ex. 8 at p. 1049. The cost reports identify and determine the costs that must be incurred by these facilities. However, the reimburse-ment rate determined by defendants is based upon an unsubstantiated prediction of infla-tion and has produced reimbursement which does not meet the costs which must be in-curred by approximately 90% of the provid-ers, including we presume most of the pro-viders which, via the cost center limits, have been identified as "efficient and economical" facilities. There are no findings which ade-quately explain why the reimbursement rates are reasonable and adequate to compensate efficient and economical facilities for their necessary costs in light of the inflation factor. Moreover, cost-to-payment studies per-formed since the implementation of the reim-bursement rate indicate that the rates are not reasonable and adequate to meet costs efficient and economical nursing facilities must incur.

*Standards for a preliminary injunction*

41. The standards for issuing a prelimi-nary injunction were discussed by the Tenth Circuit in *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098–99 (10th Cir.1991):

In order to obtain preliminary injunctive relief, the moving party must establish:

(1) substantial likelihood that the mov-ant will eventually prevail on the merits; (2) a showing that the movant will suffer irreparable injury unless the injunction issues; (3) proof that the threatened in-jury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) a showing that the injunction, if issued, would not be adverse to the public inter-est.

*Otero Savings and Loan Ass'n [v. Federal Reserve Bank of Kansas City]*, 665 F.2d 275, 278 (10th Cir.1981) (citations and quo-tations omitted). As a preliminary injunc-tion is an extraordinary remedy, *see GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir.1984), the right to relief must be clear and unequivocal. *See Penn v. San Juan Hosp.*, 528 F.2d 1181, 1185 (10th Cir.1975);

*Matzke v. Block,* 542 F.Supp. 1107, 1112–13 (D.Kan.1982). *See generally* 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2948, at 428–29 & nn. 19–21 (1973 & Supp.1991) ("It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." (footnotes omitted)).

In addition, the following types of preliminary injunctions are disfavored and they require that the movant satisfy an even heavier burden of showing that the four factors listed above weigh heavily and compellingly in movant's favor before such an injunction may be issued; (1) a preliminary injunction that disturbs the status quo; (2) a preliminary injunction that is mandatory as opposed to prohibitory; and (3) a preliminary injunction that affords the movant substantially all the relief he may recover at the conclusion of a full trial on the merits.

A preliminary injunction that alters the status quo goes beyond the traditional purpose for preliminary injunctions, which is only to preserve the status quo until a trial on the merits may be had. *See Otero Savings and Loan Association,* 665 F.2d at 277. *Penn,* 528 F.2d at 1185. *See generally Federal Practice & Procedure* § 2948, at 463–64. Mandatory injunctions are more burdensome than prohibitory injunctions because they affirmatively require the nonmovant to act in a particular way, and as a result they place the issuing court in a position where it may have to provide ongoing supervision to assure that the nonmovant is abiding by the injunction. *See Note,* 78 Harv.L.Rev. 994, 1062–63 (1965). Finally, a preliminary injunction that awards the movant substantially all the relief he may be entitled to if he succeeds on the merits is similar to the "Sentence first—Verdict Afterwards" type of procedure parodied in Alice in Wonderland, which is an anathema to our system of jurisprudence. Thus, in order to prevail on a motion for preliminary injunction where the requested injunction falls into one or more of these three categories, the movant must show that on balance, the four factors weigh heavily and compellingly in his favor. *See e.g., GTE Corp.,* 731 F.2d at 679 ("The burden on the party seeking a preliminary injunction is especially heavy when the relief sought would in effect grant plaintiff a substantial part of the relief it would obtain after a trial on the merits."); *Citizens Concerned for the Separation of Church and State v. City and County of Denver,* 628 F.2d 1289, 1299 (10th Cir,1980), *cert. denied,* 452 U.S. 963, 101 S.Ct. 3114, 69 L.Ed.2d 975 (1981) (requiring a showing of compelling circumstances to justify the imposition of preliminary injunctive relief that was mandatory and which disturbed the status quo); *Anderson v. United States,* 612 F.2d 1112, 1114 (9th Cir.1980) (noting that because a preliminary injunction that alters the status quo is "particularly disfavored" the movant must make a strong showing of entitlement).

42. The court treats the motion for preliminary injunction at bar as a request for a mandatory injunction which requires a heavier burden of proof than a motion for a prohibitory injunction. Nevertheless, we believe the burden of proof has been satisfied in this case.

*Success on the merits*

43. There has been a very strong showing that defendants did not engage in a bona fide findings process prior to implementing the current reimbursement rate and prior to making assurances to HCFA that the rate complied with the Boren Amendment. It is most probable that defendants decided to reduce the inflation factor in the reimbursement rate because of budgetary pressures. This motivation is not in itself illegal. *AMISUB, supra,* 879 F.2d at 799–800. But, there was no finding process preceding the change which substantiates the conclusion that the change in the inflation methodology—a change that affected efficient and inefficient operators alike—would still permit adequate reimbursement of the costs which must be incurred by efficient and economical facilities.

44. There was no finding that efficient and economical facilities could operate on the previous calendar year's costs plus 1%. In-

deed, the previous history of inflation in the industry, as well as the most accurate indexes available to defendants, placed the inflation figure substantially higher.

45. There was no finding that other factors in the reimbursement rate would compensate for an undervalued inflation component. There was no analysis that either the efficiency incentive or the RPPF would operate to redress the shortfall in the inflation factor. Indeed, the evidence gathered since the reimbursement rate was announced suggests otherwise and establishes a great probability that the reimbursement rate violates the substantive requirements of the Boren Amendment.

46. There was no finding that efficient and economical nursing homes can bolster productivity to match any losses suffered because of inflated costs.

47. The findings which were made concentrated on gross figures, such as average per diem rates, percentage or gross increases in total reimbursement, comparison of average rates with those of other states, or comparison with the average rate under the Medicare reimbursement system. There were also general assessments of the financial health and quality of care in the industry. These findings have extremely limited value in a facility-specific prospective reimbursement system because the average rate may not represent the rate available to efficient and economical operators, and the increases in reimbursement actually represent retrospective compensation for prior inflation rather than a reasoned estimate of current or future inflation. Additionally, cost-shifting and other factors as discussed earlier provide a more convincing explanation for the financial health and quality of care in the industry.

48. Defendants implicitly defined efficient and economical nursing facilities through the establishment of cost limits. But, defendants failed to identify payment rates which are reasonable and adequate to meet the reasonable costs such facilities must incur. In response to budget pressures, defendants chose to reimburse efficient and economical facilities on the basis of the costs which they necessarily incurred in the previous calendar year plus 1%, when the best available information indicated that the inflation rate would exceed 1%, and without identifying a factor which counterbalances the reduced inflation component. For these reasons, there is a strong likelihood that defendants' findings and assurances were arbitrary and capricious. Therefore, plaintiffs have demonstrated a greater than substantial likelihood of success in establishing a procedural and substantive violation of the Boren Amendment.

*Irreparable harm*

49. Plaintiffs have established a great likelihood that the findings process does not support the conclusion that the current reimbursement rate is adequate to meet the costs which must be incurred by efficient and economical nursing homes. Plaintiffs have also established a great likelihood that the plaintiff nursing homes are receiving less reimbursement than they would receive if there was compliance with the Boren Amendment. The Eleventh Amendment bars any award of retroactive damages against defendants. See *Temple University v. White*, 941 F.2d 201, 215 (3rd Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 873, 116 L.Ed.2d 778 (1992). Therefore, a legal remedy in damages does not exist to redress the shortfall in reimbursement from defendants' probable legal violation. The court is further convinced that no adequate administrative remedy exists for plaintiffs. Plaintiffs have alleged a systemic flaw in the reimbursement rate decided upon by the Secretary of the Department of Social and Rehabilitative Services. The court is convinced that the administrative remedies available to nursing homes do not exist to review a decision of the Secretary or to challenge a problem with the reimbursement rate which affects every facility in the Medicaid program. In sum, the probable monetary harm being suffered by plaintiffs is imminent and irreparable.

50. Defendants have suggested that plaintiffs' delay in bringing this case is grounds for denying an injunction, presumably because it implies that plaintiffs are not suffering imminent and irreparable harm. The reimbursement rate went into effect on July 1, 1992. Nursing homes in Kansas were first aware of the new rate formula about the time the formula took effect. However, this

case was not filed until March 1993. We disagree with defendants' contention for the following reasons. First, we do not believe it would be equitable to punish plaintiffs for seeking a remedy to this controversy outside of litigation. The evidence proves that plaintiffs attempted through December 1992 to reach a negotiated settlement of this matter. Second, the delay does not alter the conclusion that the probable financial harm being inflicted upon plaintiffs is irreparable. Obviously, the delay would cast doubt upon any conclusion that the reimbursement rates are a grave threat to the very existence of plaintiffs. But, that is not the evidence or the claim in this case. Finally, there is no persuasive claim that defendants have been placed at a disadvantage because of the delay in this matter.

*Balance of harms*

51. Plaintiffs have demonstrated that the injury to their interests outweighs whatever damage preliminary injunctive relief would cause defendants. The preliminary relief ordered in this case will require increased administrative costs by defendants. But, there is no indication that these costs would exceed the financial injury being suffered by plaintiffs.

*Public interest*

52. Plaintiffs have demonstrated that a preliminary injunction would not be adverse to the public interest. Indeed, the premise of this case is that defendants have violated the interests of the public as codified by the Boren Amendment. To this degree, an injunction serves the public interest. See *Temple University v. White*, 941 F.2d at 220 n. 27.

*CONCLUSION*

53. For the above-stated reasons and on the basis of the above-stated findings of fact and conclusions of law, the court shall deny defendants' motion to dismiss. The court shall grant plaintiffs' motion for a preliminary injunction and make the following order: defendants are enjoined from continuing to implement and maintain the Medicaid reimbursement rates established with the methodology set forth in TN 92–22; defendants are further directed to take all neces-

sary steps to develop reimbursement rates in compliance with federal law consistent with this memorandum and order; defendants and plaintiffs are directed to confer in an effort to agree to an interim rate to be paid pending the adoption of new rates which comply with federal law or a final judgment in favor of defendants in this case; the parties are directed to report to the court the progress of their efforts within seven days of the date of this order; the parties are further advised that on the basis of the evidence so far presented, the court believes the inflation factors of the reimbursement formula are in primary need of correction; and the parties are further directed to confer to agree upon a means by which payment into the court could be employed in lieu of a bond in this case. A conference call to discuss these matters shall be scheduled for Monday, May 17, 1993 at 11:00 a.m.

**IT IS SO ORDERED.**