31 F.3d 1536
 45 Soc.Sec.Rep.Ser. 320, Medicare & Medicaid Guide
P 42,572
KANSAS HEALTH CARE ASSOCIATION, INC.; Kross Development
Company, Inc., doing business as Rossville Valley Manor;
Vintage Group, Inc., doing business as Gatewood Care Center;
Innovative Health of Kansas, Inc., doing business as
Lakewood Health Care Center; Americare Properties, Inc.,
doing business as Pleasant Valley Manor and Moran Manor;
Riverview Manor, Inc., doing business as Riverview Manor,
for themselves and all others similarly situated, Plaintiffs-Appellees,
v.
KANSAS DEPARTMENT OF SOCIAL AND REHABILITATION SERVICES;
Donna Whiteman, Secretary, Kansas Department of
Social and Rehabilitation Services,
Defendants-Appellants.
American Health Care Association, Amicus Curiae.
 No. 93-3182.
 United States Court of Appeals,
Tenth Circuit.
 Aug. 4, 1994.
Rehearing Denied Sept. 7, 1994.
 
 Phyllis D. Thompson, Covington & Burling, Washington, DC (Vicki J. Larson and Alicia M. Strohl, Covington & Burling, Washington, DC, and Bruce A. Roby, Dept. of Social and Rehabilitation Services, Topeka, KS, with her on the briefs), for appellants.
 Kevin M. Fowler (John C. Frieden and Randall J. Forbes with him on the briefs), Frieden, Haynes & Forbes, Topeka, KS, for appellees.
 Joel M. Hamme and Joseph W. Metro, Reed Smith Shaw & McClay, Washington, DC, on the briefs, for amicus curiae, American Health Care Ass'n.
 Before ANDERSON and TACHA, Circuit Judges, and ROSZKOWSKI,* Senior District Judge.
 STEPHEN H. ANDERSON, Circuit Judge.
 
 
 1
 Defendants appeal from orders of the district court imposing a mandatory preliminary injunction and awarding plaintiffs interim relief on their claim that defendants' Medicaid payment plan for nursing home facilities violated federal law. We affirm.
 
 BACKGROUND
 
 2
 Plaintiff Kansas Health Care Association, Inc. ("KHCA") is a nursing home trade association representing approximately half of the 400 nursing homes in Kansas. The remaining five plaintiffs are corporations that own and operate six Medicaid-certified nursing homes in Kansas.[1] Defendant Kansas Department of Social and Rehabilitation Services ("SRS") is the state agency charged with administering the reimbursement of nursing homes that participate in the Medicaid program. The other defendant, Donna Whiteman, is the Secretary of SRS, whom plaintiffs sue in her official capacity.
 
 
 3
 Kansas participates in the Medicaid program, a joint federal/state arrangement authorized by Title XIX of the Social Security Act, 42 U.S.C. Sec. 1396-1396v ("Medicaid Act"), under which the federal government gives grants to states to assist them in providing medical, nursing home, and other care for certain low-income individuals. See Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498, 502, 110 S.Ct. 2510, 2513-14, 110 L.Ed.2d 455 (1990). The decision to participate in the Medicaid program is voluntary, but participating states are thereby obligated to comply with the Act and regulations promulgated by the Secretary of the United States Department of Health and Human Services ("Secretary"). Id.; AMISUB (PSL), Inc. v. Colorado Dep't of Social Servs., 879 F.2d 789, 794 (10th Cir.1989), cert. denied, 496 U.S. 935, 110 S.Ct. 3212, 110 L.Ed.2d 660 (1990).
 
 
 4
 To qualify for federal Medicaid funds, a state must submit a "plan for medical assistance" to the Health Care Financing Administration ("HCFA"), the Secretary's delegate with responsibility for administering the Medicaid program. 42 U.S.C. Sec. 1396.[2] The plan must contain a detailed and comprehensive description of the state's Medicaid program, including reimbursement procedures for those persons or entities who provide services to Medicaid patients. 42 U.S.C. Sec. 1396a(a); 42 C.F.R. Sec. 430.10 (1993).
 
 
 5
 The Boren Amendment to the Medicaid Act governs payment rates to nursing home facilities and requires a state plan to:
 
 
 6
 provide ... for payment ... of the ... services ... through the use of rates (determined in accordance with methods and standards developed by the State ...) ... which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards....
 
 
 7
 42 U.S.C. Sec. 1396a(a)(13)(A); see also 42 C.F.R. Sec. 447.250(a).[3] The Act and implementing regulations similarly obligate state plans to provide for the payment of such costs "consistent with efficiency, economy, and quality of care." 42 U.S.C. Sec. 1396a(a)(30); 42 C.F.R. Sec. 447.250(b).
 
 
 8
 The Boren Amendment contains both a procedural and a substantive component. Each creates rights enforceable by 42 U.S.C. Sec. 1983. See Wilder, 496 U.S. at 524, 110 S.Ct. at 2525; Kansas Health Care Ass'n v. Kansas Dep't of Social and Rehabilitation Servs., 958 F.2d 1018, 1020 (10th Cir.1992) ("KHCA I "). The procedural component involves two separate parts:
 
 
 9
 First, the State Medicaid Agency must engage in a "finding" process that all federal requirements have been met to substantiate its assurances, including the assurances that its payment rates satisfy the "efficiency and economy" requirement. Second, the State Medicaid Agency must supply HCFA with "assurances" that all federal requirements have been met, including the "efficiency and economy" requirement.
 
 
 10
 AMISUB, 879 F.2d at 796 (citing 42 U.S.C. Sec. 1396a(a)(13)(A); 42 C.F.R. Secs. 447.205, 447.250(a), 447.253(a) and (b)). The state's "findings" precede the "assurances" to HCFA. The findings are not themselves, however, reviewed by HCFA; only the assurances are.
 
 
 11
 We have further held that the findings requirement encompasses a three-part determination: the state agency must "at a minimum, ... make 'findings' which identify and determine (1) efficiently and economically operated hospitals; (2) the costs that must be incurred by such hospitals; and (3) payment rates which are reasonable and adequate to meet the reasonable costs of the state's efficiently and economically operated hospitals." AMISUB, 879 F.2d at 796 (emphasis original).[4] While a state is "free to create its own method for arriving at the required findings," the requirement to make findings is real: "[m]ere recitation of the wording of the federal statute is not sufficient for procedural compliance. There is a presumption that a state will engage in a bona fide finding process before it makes assurances to HCFA that the required findings have been made." Id. at 797. Several courts have interpreted AMISUB's identification and determination requirement to not mandate explicit "findings," but to permit its "accomplishment through the terms of the state plan itself." New Jersey Ass'n of Health Care Facilities v. Gibbs, 838 F.Supp. 881, 898 (D.N.J.1993); Folden v. Washington Dep't of Social and Health Servs., 744 F.Supp. 1507, 1533 (W.D.Wash.1990), aff'd, 981 F.2d 1054 (9th Cir.1992).
 
 
 12
 Substantively, to satisfy the Boren Amendment's "reasonable and adequate" standard, Medicaid payments must fall within a "zone or range of reasonableness." Colorado Health Care Ass'n, 842 F.2d at 1167; see also Folden v. Washington Dep't of Social and Health Servs., 981 F.2d 1054, 1058 (9th Cir.1992); West Virginia Univ. Hosps., Inc. v. Casey, 885 F.2d 11, 26 (3d Cir.1989), cert. denied, 496 U.S. 936, 110 S.Ct. 3213, 110 L.Ed.2d 661 (1990).[5] The Boren Amendment does not specifically state whether all or only a certain percentage of Medicaid patient expenditures must be reimbursed.[6] Indeed, an issue in this case is whether all "allowable" reasonable costs must be reimbursed, or whether some lesser percentage satisfies the Medicaid Act.[7] Individual components of the reimbursement rate do not necessarily determine compliance with the Boren Amendment. "It is the resulting overall payment which is evaluated for statutory compliance." Colorado Health Care Ass'n, 842 F.2d at 1167; Folden, 744 F.Supp. at 1535.
 
 
 13
 The state must amend its plan to reflect changes in federal or state law or policy, and to reflect any changes in the operation of its Medicaid program. Amendments must be submitted to the HCFA for approval. 42 C.F.R. Sec. 430.12(c). Thus, any amendments which change the payment rate for services, such as nursing home services, must receive HCFA approval. Id. Sec. 447.253(a). Whenever a state changes its payment rates, but in any event not less than annually, the state agency administering its Medicaid program must make findings that the payment rates are "reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated providers...." Id. Sec. 447.253(b)(1).
 
 
 14
 States, rather than the federal government, administer their own Medicaid programs, and each state has " 'wide discretion in administering its local program' " provided it complies with federal Medicaid law. Erie County Geriatric Ctr. v. Sullivan, 952 F.2d 71, 74 (3d Cir.1991) (quoting Lewis v. Hegstrom, 767 F.2d 1371, 1373 (9th Cir.1985)). While states have considerable discretion, their determination of reasonable reimbursement rates must be principled: "[t]he state must articulate 'a rational connection between the facts found and the choice made.' " Colorado Health Care Ass'n, 842 F.2d at 1167 (quoting Baltimore Gas and Elec. Co. v. Natural Resources Defense Council, 462 U.S. 87, 105, 103 S.Ct. 2246, 2256, 76 L.Ed.2d 437 (1983)); see also Pinnacle Nursing Home v. Axelrod, 928 F.2d 1306, 1314 (2d Cir.1991) (A state must "establish a nexus between the costs of operating efficient and economic nursing facilities and the proposed reimbursement rates under the state plan.").
 
 
 15
 Kansas has by statute elected to participate in the Medicaid program. See Kan.Stat.Ann. Sec. 39-708c. Kansas employs a prospective-payment, facility-specific, Medicaid reimbursement system. On July 1 of each year, SRS establishes a new reimbursement rate plan. The plan at issue in this case is plan TN 92-22, which was developed in June, 1992, took effect July 1, 1992, and expired June 30, 1993. Reimbursement rates are recalculated every year.
 
 
 16
 Under TN 92-22, state auditors engaged in a "desk review" of each facility's costs as reported for the 1991 calendar year. In the desk review process, auditors make adjustments for arithmetical errors, for reclassification of costs between categories, or for any clearly unallowable costs. The reported costs of facilities with an occupancy rate of less than 85% or with administrative salaries exceeding a certain level were adjusted. These adjusted costs were considered "allowable" costs. Allowable costs were divided into four costs centers--administrative, room and board, health care, and plant operating--and divided by total patient days. This resulted in an average cost per patient day for each cost center in each facility.
 
 
 17
 Because the reimbursement rate for the rate year July 1, 1992, through June 30, 1993, was based on 1991 calendar year allowable costs, those costs had to be adjusted for inflation. The inflation adjustment occurred in two ways. Twenty-five to thirty percent of a nursing home's allowed costs were adjusted using the Consumer Price Index ("CPI"), to account for "historical inflation"--inflation which had occurred since the reported costs were incurred. This historical inflation rate applied to certain allowable costs for the period between July 1, 1991, and May 31, 1992, the last date for which the CPI was available prior to ratesetting. In TN 92-22, the rate was 2.7%.[8]
 
 
 18
 Other costs (employee salaries, payroll taxes and other nursing home costs) representing approximately 60-70% of a facility's costs were adjusted, using the Data Resources, Inc. ("DRI") Market Basket index, an inflation index specific to the costs of nursing homes, to account for future or estimated inflation--anticipated inflation occurring during the coming rate year.[9] The DRI is typically higher than the CPI.
 
 
 19
 While in prior years, the DRI estimated inflation rate was applied to the period from the last date for which the CPI was available to the midpoint of the rate-paying year, in TN 92-22 the estimated inflation rate was effectively applied to a shorter period of time--i.e. the one month between the last date for which the CPI was available and the first day of the rate-paying period (July 1, 1992). In TN 92-22, this future inflation rate was 0.4%.[10] As the district court found with respect to the overall inflation adjustment under TN 92-22, "[t]he bottom line, as described by plaintiff's expert, is that the actual allowable costs of individual nursing homes in the current rate-paying year were forecasted to be the actual allowable costs of the homes in 1991 plus 1% for inflation." Kansas Health Care Ass'n v. Kansas Dep't of Social and Rehabilitative Servs., 822 F.Supp. 687, 694 (D.Kan.1993). Plaintiffs introduced evidence that in fact nursing homes experienced a 3.35% rate of inflation during the nine-month period ending March 31, 1993. Pls.' Resp. to Questions, Appellants' App. at 251. Defendants introduced no evidence of specific studies or findings made with respect to the decision to change the way in which estimated inflation was calculated. Tr. of Hr'g, Appellants' App. at 365.
 
 
 20
 SRS then took these allowable costs per patient per cost center, as adjusted for both historical and estimated inflation, and arrayed them from lowest to highest in order to determine a ceiling for reimbursement for each cost center. For health care and room and board, the ceiling was the 90th percentile; for plant operating, the ceiling was the 85th percentile; and for administrative costs, the ceiling was the 75th percentile. This meant that, for example, reimbursement for room and board was limited to the costs of a home at the 90th percentile of the array. These percentile limits, as defendants admit, "reflect economically and efficiently run facilities." If a facility's costs, as adjusted for inflation, are below the percentile limits, its reimbursement rate is based upon its actual costs as adjusted for inflation, not the percentile limit. Thus, as the district court noted:
 
 
 21
 a nursing home's actual costs could be below the cost limits in each cost center, but the home might not be fully reimbursed for the costs it actually incurred during the rate year, if the home's actual Medicaid costs exceeded the costs incurred by the home in the last cost report as adjusted for inflation. Underreimbursement is the actual result if any shortfall in reimbursement is not compensated for by incremental funding for an efficiency incentive and for real property costs.
 
 
 22
 Kansas Health Care Ass'n, 822 F.Supp. at 692.
 
 
 23
 Additionally, TN 92-22 provided for an incentive factor to increase the per diem rates by up to fifty cents for those facilities whose plant operating and administrative costs compared favorably to other facilities.[11] Finally, certain ownership costs such as depreciation, mortgage interest, and lease expenses were reimbursed by means of a fixed, facility-specific Real and Personal Property Fee ("RPPF"). This RPPF is based upon 1983 or 1984 cost reports, and is not adjusted for inflation. The district court found that, as a rough estimate, approximately half of all nursing homes in the Medicaid program were fully reimbursed by the RPPF for their actual ownership costs. Id.
 
 
 24
 Defendants submitted TN 92-22 and SRS Secretary Whiteman's accompanying assurances to HCFA on August 12, 1992. These assurances have apparently never been formally approved or disapproved by HCFA. As a result, TN 92-22 went into effect.[12]
 
 
 25
 Plaintiffs filed suit on March 2, 1993, eight months after TN 92-22 went into effect, seeking declaratory and injunctive relief on the ground that the plan violated the Boren Amendment. After a four and one-half day hearing, the district court granted plaintiffs' requested relief, finding that plaintiffs had established irreparable harm and were likely to succeed on their Boren Amendment claim. Id. at 698-99. The court enjoined further payments under TN 92-22 and ordered SRS to develop new rates. Id. at 699. When the parties were unable to agree on new rates, the court issued an order setting an interim rate[13] and ordering the SRS to pay into an interest-bearing account the difference between the interim rate and the TN 92-22 rates. This relief applied to all Medicaid-participating nursing homes in Kansas.
 
 DISCUSSION
 
 26
 Defendants appeal from the grant of a preliminary injunction. The district court may grant a preliminary injunction if the party seeking it shows: (1) a substantial likelihood of prevailing on the merits; (2) irreparable harm in the absence of the injunction; (3) proof that the threatened harm outweighs any damage the injunction may cause to the party opposing it; and (4) that the injunction, if issued, will not be adverse to the public interest. Autoskill Inc. v. Nat'l Educ. Support Sys., Inc., 994 F.2d 1476, 1487 (10th Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 307, 126 L.Ed.2d 254 (1993); Resolution Trust Corp. v. Cruce, 972 F.2d 1195, 1198 (10th Cir.1992). We review the grant of a preliminary injunction for abuse of discretion, reversing that grant only if the district court " 'abuses its discretion, commits an error of law, or is clearly erroneous in its preliminary factual findings.' " Autoskill, 994 F.2d at 1487 (quoting Hartford House, Ltd. v. Hallmark Cards, Inc., 846 F.2d 1268, 1270 (10th Cir.), cert. denied, 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988)); SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096, 1098 (10th Cir.1991). Because a preliminary injunction is an "extraordinary remedy ... the right to relief must be clear and unequivocal." SCFC ILC, Inc., 936 F.2d at 1098 (citations omitted). Mandatory preliminary injunctions impose "an even heavier burden [on the movant] of showing that the four factors listed above weigh heavily and compellingly in movant's favor." Id.
 
 
 27
 Defendants argue that the district court erred as a matter of law in: (1) finding that plaintiffs established irreparable harm; (2) finding that plaintiffs had demonstrated a likelihood of success on the merits of their Boren Amendment claim; and (3) in granting preliminary relief to all Medicaid-participating Kansas nursing homes without first certifying a class as required by Fed.R.Civ.P. 23(b).[14]
 
 I. ESTABLISHMENT OF IRREPARABLE HARM
 
 28
 Defendants argue the district court erred in finding that plaintiffs had established irreparable harm when it relied on the Eleventh Amendment's immunity as the "sole basis" for its finding, and when it failed to consider plaintiffs' delay in seeking relief as indicative of a lack of harm. The district court found irreparable harm, stating that plaintiffs had established a great likelihood that the reimbursement rates were inadequate under the Boren Amendment, that the Eleventh Amendment eliminated a legal remedy in damages, and that no adequate administrative remedy existed for plaintiffs. Kansas Health Care Ass'n, 822 F.Supp. at 698.
 
 
 29
 A. Eleventh Amendment.
 
 
 30
 The Eleventh Amendment bars retrospective monetary relief against a state. Green v. Mansour, 474 U.S. 64, 68, 106 S.Ct. 423, 425-26, 88 L.Ed.2d 371 (1985); Edelman v. Jordan, 415 U.S. 651, 677-78, 94 S.Ct. 1347, 1362-63, 39 L.Ed.2d 662 (1974). We do not read the district court's opinion as finding irreparable harm established on the sole basis of the Eleventh Amendment's bar to retrospective monetary relief. Rather, the district court correctly analyzed the issue in terms of whether the plaintiffs had established harm--a legally cognizable injury to them resulting from noncompliance with the Boren Amendment--and whether plaintiffs had any adequate remedy. Because the Eleventh Amendment bars a legal remedy in damages, and the court concluded no adequate state administrative remedy existed, the court held that plaintiffs' injury was irreparable. We agree. See Temple Univ. v. White, 941 F.2d 201, 215 (3d Cir.1991) ("As to the inadequacy of legal remedies, the Eleventh Amendment bar to an award of retroactive damages against the [state] clearly establishes that any legal remedy is unavailable and the only relief available is equitable in nature.") (citation omitted), cert. denied, --- U.S. ----, 112 S.Ct. 873, 116 L.Ed.2d 778 (1992); see also Kansas Hosp. Ass'n v. Whiteman, 835 F.Supp. 1556, 1563-64 (D.Kan.1993) (Eleventh Amendment bar evidences irreparability). Thus, in our view, the Eleventh Amendment bar simply indicates irreparability, but does not, in itself, establish harm. Contrary to defendants' view, the district court opinion said no more.
 
 
 31
 B. Delay.
 
 
 32
 Defendants argue that plaintiffs' delay in seeking injunctive relief undermines their claim of irreparable injury. While delay can undermine a claim of irreparable harm, we hold that it does not in this case. "As a general proposition, delay in seeking preliminary relief cuts against finding irreparable injury." Gibbs, 838 F.Supp. at 928; see also Lydo Enters., Inc. v. City of Las Vegas, 745 F.2d 1211, 1213 (9th Cir.1984). However, the district court found that "[t]he evidence proves that plaintiffs attempted through December 1992 to reach a negotiated settlement of this matter." Kansas Health Care Ass'n, 822 F.Supp. at 699. Within three months of having failed to reach such a settlement plaintiffs commenced this action. Under those circumstances, we are reluctant to hold that plaintiffs' delay should be fatal to their claim of irreparable injury.
 
 
 33
 Plaintiffs also claim that they needed to wait for empirical cost data to determine how they were faring under TN 92-22. Defendants argue that the very fact that they needed such data to verify their ongoing injury, rather than immediately appreciating its imminence and extent, undermines plaintiffs' claim of such injury. We are reluctant to criticize plaintiffs for awaiting specific and concrete documentation of the adequacy of their Medicaid reimbursement rates. Without such documentation, they run the risk of having their claimed injury be deemed speculative. Further, as we discuss below, we do not believe that the only injury acute enough to justify injunctive relief is imminent bankruptcy or the imminent complete demise of plaintiffs' business.
 
 
 34
 Additionally, as the district court observed, the delay does not alter any conclusion, based upon the evidence presented, that the reimbursement rates do or do not inflict harm upon plaintiffs, even though such delay suggests that the reimbursement rates are not "a grave threat to the very existence of plaintiffs." Id. However, plaintiffs do not, nor need they, assert that they are on the verge of going out of business in order to establish that they are suffering imminent and irreparable harm because of a violation of the Boren Amendment.[15]
 
 
 35
 Finally, we agree with the district court that defendants have not claimed that they are somehow disadvantaged because of the delay. We therefore find no error or abuse of discretion in the district court's conclusion that plaintiffs established that they have or will suffer an irreparable harm, which is not undermined by their delay in commencing this action.
 
 
 36
 II. LIKELIHOOD OF SUCCESS ON BOREN AMENDMENT CLAIM
 
 
 37
 Defendants argue the district court erred in finding that plaintiffs had demonstrated a likelihood of success on the merits of their Boren Amendment claim, because the court erroneously concluded that the SRS' "findings" were procedurally inadequate and it erroneously awarded substantive relief based upon that perceived procedural violation alone. In particular, defendants claim that the court erred when it required the SRS to find that its rates would in fact fully reimburse all facilities for their allowable costs.
 
 
 38
 In reviewing the validity of a state Medicaid reimbursement plan, we "must determine whether the plan is procedurally and substantively in compliance with the requirements of the Federal Medicaid Act and its implementing regulations." AMISUB, 879 F.2d at 795. That is a question of law, reviewable de novo. Id. We do not, therefore, limit our review to the more deferential arbitrary and capricious standard usually applicable to agency actions.[16]
 
 
 39
 The district court granted plaintiffs' motion for a preliminary injunction, holding that plaintiffs had made "a very strong showing that defendants did not engage in a bona fide findings process prior to implementing the current reimbursement rate and prior to making assurances to HCFA that the rate complied with the Boren Amendment." Kansas Health Care Ass'n, 822 F.Supp. at 697. The court further held that plaintiffs had established "a great probability that the reimbursement rate violates the substantive requirements of the Boren Amendment." Id. at 698. We agree.
 
 
 40
 A. Procedural Compliance.
 
 
 41
 As we have previously stated, the Boren Amendment's procedural requirements entail the making of findings "which identify and determine (1) efficiently and economically operated hospitals; (2) the costs that must be incurred by such hospitals; and, (3) payment rates which are reasonable and adequate to meet the reasonable costs of the state's efficiently and economically operated hospitals." AMISUB, 879 F.2d at 796. William McDaniel, the SRS employee whom defendants stipulated was most familiar with the findings file for TN 92-22, testified that SRS considered those facilities which stayed within the cost center ceilings as efficiently and economically operated. Tr. of Hr'g, Supplemental App. at 55-56. Thus, defendants implicitly identified and determined efficiently and economically operated facilities.
 
 
 42
 Mr. McDaniel testified that he did not make any effort to specifically determine the costs that must be incurred by an economically and efficiently operated facility to meet the needs of Medicaid patients in the upcoming rate-paying year, nor did he make any findings relating thereto. Id. at 58-59. Rather, SRS employed the system it had utilized in prior years of calculating reimbursement rates for each facility based upon that facility's historical costs, as adjusted for inflation. In doing so, the evidence indicated that defendants simply failed to make the requisite findings to establish a rational nexus between the facts and data and the reimbursement rate they selected.
 
 
 43
 As all parties agree, the most fundamental change in TN 92-22 from previous reimbursement rate methodologies was the change in the way estimated inflation was calculated. While this was only one element in the reimbursement rate calculus, it had a significant impact on the overall rate because it applied to some 60-70% of a facility's costs. Defendants do not dispute the district court's conclusion that the "bottom line" was that "the actual allowable costs of individual nursing homes in [TN 92-22] rate-paying year were forecasted to be the actual allowable costs of the homes in 1991 plus 1% for inflation." Kansas Health Care Ass'n, 822 F.Supp. at 694.
 
 
 44
 The evidence shows, however, that Mr. McDaniel, the person most familiar with the findings file for TN 92-22, had no idea why the inflation adjustment was changed. Defendants produced no evidence of any findings on the impact of such a change, or on the reasons for making that adjustment. Because Kansas' reimbursement system is prospective and facility-specific, based upon the historical costs of each facility, the inflation adjustment is a significant component of the system. Given defendants' admission that they made no effort to specifically determine what the necessarily incurred costs of an economically and efficiently operated facility would be in the upcoming rate-paying year, and that they made no findings on that point, it was incumbent upon them to make adequate findings justifying their assurances that the historical-based rates were adequate and reasonable. They simply failed to do that. We therefore affirm the district court's conclusion that plaintiffs established a great likelihood of showing a procedural violation of the Boren Amendment.
 
 
 45
 B. Substantive Compliance.
 
 
 46
 We further agree with the district court that plaintiffs established a great likelihood that TN 92-22 violated the substantive requirements of the Boren Amendment.[17] As the Supreme Court has stated, the Boren Amendment was designed "to decentralize the method for determining rates, but not to eliminate a State's fundamental obligation to pay reasonable rates." Wilder, 496 U.S. at 515, 110 S.Ct. at 2520. Thus, although reasonable rates encompass a zone of reasonableness, not a pinpoint, that zone must nonetheless itself be reasonable and adequate.
 
 
 47
 Defendants argue that the district court erroneously held that a Medicaid reimbursement plan must reimburse all of the allowable costs of efficiently and economically operated providers. They cite our language in Colorado Health Care Ass'n, where we observed that, under the Boren Amendment, "states are not required to reimburse providers for costs they actually or even reasonably incur." 842 F.2d at 1169. That observation, however, was made in the context of discussing the significant and substantive shift from the pre-Boren Amendment standard of reimbursement for reasonable costs actually incurred to the post-Boren Amendment standard of prospectively determined payment for the necessary costs of efficient and economical providers. We later observed in AMISUB that "pursuant to [the Boren Amendment], [efficiently and economically operated] hospitals must be compensated for their reasonable costs for the plan to comply with federal Medicaid law." AMISUB, 879 F.2d at 799. Thus, under AMISUB, once a state has identified and determined economically and efficiently operated facilities and the costs which those facilities must incur, its prospectively determined reimbursement rates must be "reasonable and adequate to meet" those costs. Id. at 796. The plain language of the Boren Amendment permits that interpretation.
 
 
 48
 This does not mean that all costs in fact incurred in the upcoming rate-paying year must be reimbursed; only the reasonable allowable costs previously identified as necessarily incurred by an efficiently and economically operated facility.[18] States may accomplish desirable Medicaid cost containment and efficiency through the identification and determination of economically and efficiently operated facilities and through the determination of what costs are necessary to provide appropriate and quality Medicaid services.
 
 
 49
 In this case, as the district court found, the evidence showed consistent and widespread underreimbursement for Medicaid services. Defendants do not dispute the following findings made by the district court:
 
 
 50
 A study of the 1992 cost reports of 91 nursing homes in Kansas (approximately 25% of all nursing facilities participating in the Medicaid program in Kansas), demonstrated that 91% or 83 out of the 91 homes were not reimbursed for the "allowable" costs they incurred in the first six months of the current rate-paying period.
 
 
 51
 . . . . .
 
 
 52
 [A]nother study of the 91 homes, which accounts for the RPPF and property costs, but does not make the 1.8% estimated review and audit reduction, determined that 82 out of 91 homes were not reimbursed their actual costs for the calendar year 1992.
 
 
 53
 . . . . .
 
 
 54
 Defendants also demonstrated that one of the plaintiff nursing homes is being overreimbursed for Medicaid costs in the first six months of the rate-paying year. The other five fall with a range of reimbursement of 89.77% to 97.49%.
 
 
 55
 . . . . .
 
 
 56
 Defendants also presented data from unreviewed and unaudited cost reports of 277 homes for the 1992 calendar year which show a reimbursement rate of 94% for homes in the lower cost quartile and 84% for homes in the higher cost quartile, for the first six months of the rate-paying year.
 
 
 57
 . . . . .
 
 
 58
 In 1991, there were 263 facilities with all cost centers below limits.... [T]he reimbursement rate ... does not meet the costs which must be incurred by approximately 90% of the providers, including we presume most of the providers which, via the cost center limits, have been identified as "efficient and economical" facilities.
 
 
 59
 Kansas Health Care Ass'n, 822 F.Supp. at 695-96. Additionally, an expert testified that, of the 25 nursing home facilities with which he works closely, all but one are not being fully reimbursed for costs which are under the cost center limits. Tr. of Hr'g, Supplemental App. at 68.
 
 
 60
 Defendants argue that the district court's analysis impermissibly assumed that the Boren Amendment's "costs which must be incurred" is equivalent to allowable reasonable costs, and that "[e]ven if a nursing home's allowable costs fall under all of the cost center limits used in the State Plan, it is not reasonable to assume that the facility incurs no costs that are unnecessary." Appellants' Reply Brief at 12 n. 6. What defendants ignore is our holding in AMISUB that the "plain language of federal Medicaid law" requires the state "at a minimum to make 'findings' which identify and determine ... the costs that must be incurred by [efficiently and economically operated] hospitals." AMISUB, 879 F.2d at 796. Having failed to make such findings, defendants may not now suggest that the reasonable allowable costs of facilities they have implicitly identified as economically and efficiently operated may include unnecessary costs which need not be reimbursed. Given what the district court termed the demonstrated "consistent and significant shortfall in reimbursement," 822 F.Supp. at 696, defendants may not undermine those findings through the use of their own inadequate findings.
 
 
 61
 Defendants also charge that the district court opinion was inadequate in its substantive analysis because it failed to conduct an inquiry into individual provider operations to determine whether "costs which must be incurred" are in fact being paid. Defendants assert that our prior opinion in KHCA I required such detailed analysis. KHCA I in fact observed that the procedural requirements we noted in AMISUB, 879 F.2d at 796, "clearly demand that the state agency, SRS in this case, undertake a detailed evaluation of individual health care providers. This fact alone indicates that the district court's review of these procedural findings likely will force the court to scrutinize specific health care providers." KHCA I, 958 F.2d at 1023. We went on to observe that "[h]ad the state made absolutely no findings or findings that were clearly inadequate, we could conclude ... that SRS failed to comply with federal law." Id. As we have already indicated, that is what occurred here--the evidence showed SRS made no findings explaining the changed inflation rate or how that change would affect the reasonableness and adequacy of the reimbursement rates, nor did it make specific findings on the necessary costs of efficiently and economically operated facilities. In that situation, we do not read KHCA I as mandating the kind of facility-by-facility inquiry defendants claim is necessary.
 
 
 62
 In sum, we affirm the district court's conclusion that plaintiffs have demonstrated a great likelihood of prevailing on their claimed substantive violation of the Boren Amendment.
 
 III. CLASS CERTIFICATION
 
 63
 Defendants finally argue that, even if the district court correctly granted plaintiffs' preliminary injunction, it erred in effectively granting class-wide relief without certifying a class pursuant to Fed.R.Civ.P. 23. The district court held that class certification was not necessary, citing the Supreme Court's statement in Wilder, 496 U.S. at 520 n. 18, 110 S.Ct. at 2523 n. 18, that "[i]f a State errs in finding that its rates are reasonable and adequate ... then a provider is entitled to have the court invalidate the current state plan and order the State to promulgate a new plan that complies with the Act." The district court further held that the invalidation of TN 92-22 "will affect the interests of all the potential class members, regardless of whether a class is formally certified." Kansas Health Care Ass'n, 822 F.Supp. at 689. We agree.
 
 
 64
 This court has "recognized the line of authority indicating that a class certification is unnecessary if all the class members will benefit from an injunction issued on behalf of the named plaintiffs." Everhart v. Bowen, 853 F.2d 1532, 1538-39 n. 6 (10th Cir.1988), rev'd on other grounds, 494 U.S. 83, 110 S.Ct. 960, 108 L.Ed.2d 72 (1990); see also 7B C. Wright, A. Miller & M. Kane, Federal Practice and Procedure Sec. 1785.2 (1986 & Supp.1994). We think it clear that that is the case here. As the district court held, "[w]e have no reason to doubt that defendants would apply any changes made to the reimbursement formula uniformly to nursing homes in Kansas." Kansas Health Care Ass'n, 822 F.Supp. at 689. We therefore affirm the district court's conclusion that class certification was unnecessary in this case.
 
 CONCLUSION
 
 65
 For the foregoing reasons, we AFFIRM the decisions of the district court granting a preliminary injunction and awarding interim relief.
 
 
 
 *
 The Honorable Stanley J. Roszkowski, Senior United States District Judge for the Northern District of Illinois, sitting by designation
 
 
 [1]
 The remaining plaintiffs and appellees are Kross Development Company, Inc., d/b/a Rossville Valley Manor; Vintage Group, Inc., d/b/a Gatewood Care Center; Innovative Health of Kansas, Inc., d/b/a Lakewood Health Care Center; Americare Properties, Inc., d/b/a Pleasant Valley Manor and Moran Manor; and Riverview Manor, Inc., d/b/a Riverview Manor
 
 
 [2]
 HCFA is the agency within HHS which Congress has designated to administer the Medicaid program. See AMISUB, 879 F.2d at 794 n. 9
 
 
 [3]
 The Boren Amendment, enacted in 1980 as part of the Omnibus Budget Reconciliation Act of 1980, Pub.L. No. 96-499, Sec. 962(a), 94 Stat. 2599, 2650 (1980), changed the method of Medicaid reimbursement. When originally enacted, the Medicaid Act provided for retrospective reimbursement for the "reasonable cost" of services actually provided to Medicaid patients. See Wilder, 496 U.S. at 507 n. 7, 110 S.Ct. at 2516 n. 7. The Boren Amendment was designed to give the states more responsibility for and flexibility in determining reimbursement rates, in order to reduce rising Medicaid costs. Id. at 506, 110 S.Ct. at 2515-16; see also Oregon Ass'n of Homes for the Aging v. Oregon, 5 F.3d 1239, 1243 (9th Cir.1993); Colorado Health Care Ass'n v. Colorado Dep't of Social Servs., 842 F.2d 1158, 1165-66 (10th Cir.1988). In response to the Boren Amendment, most states now have prospective reimbursement plans, such as the Kansas plan at issue in this case, in which "providers are paid in advance and payments are calculated according to the State's formula for what such care should cost." Wilder, 496 U.S. at 507 n. 7, 110 S.Ct. at 2516 n. 7. Providers who exceed those prospectively determined costs must absorb their losses
 The Boren Amendment as now written reflects amendments enacted in 1987 and 1990 to implement appropriate reimbursement procedures designed to compensate for compliance with extensive nursing home reforms enacted in 1987, as part of the Omnibus Reconciliation Act of 1987, Pub.L. No. 100-203, Sec. 4211, 101 Stat. 1330-160.
 
 
 [4]
 While AMISUB dealt with hospital reimbursement, its holding applies equally to nursing home providers. See KHCA I, 958 F.2d at 1023
 
 
 [5]
 The HCFA, in response to comments concerning its rules and regulations, has also indicated that the term "reasonable and adequate" should not be considered "a precise number, but rather a rate which falls within a range of what could be considered reasonable and adequate." 48 Fed.Reg. 56,049
 
 
 [6]
 As the Seventh Circuit has acknowledged, the Boren Amendment's failure to define certain key terms has rendered interpretation of its requirements problematic:
 Construing the Medicaid Act is made difficult by its failure to define "reasonable and adequate," "efficiently and economically operated facilities," or "costs which must be incurred." ... It comes as no great surprise that this definitional abyss has spawned considerable litigation....
 Lett v. Magnant, 965 F.2d 251, 253 (7th Cir.1992).
 
 
 [7]
 In AMISUB, we held that Colorado's Medicaid reimbursement plan violated the substantive requirements of the Boren Amendment where "no Colorado hospital, no matter how efficiently and economically operated, [was] reasonably and adequately reimbursed." AMISUB, 879 F.2d at 799. Cf. Gibbs, 838 F.Supp. at 901 n. 11 ("The Court does not hold, nor does it mean to suggest, that a state system designed in advance to reimburse only 86% of the industry's aggregate costs satisfies the Boren Amendment.")
 
 
 [8]
 In response to questions from the district court, both parties presented evidence as to what nursing home facility costs were adjusted for inflation. Defendants presented evidence that approximately 27% of the unaudited allowable costs of a facility were subject to historical inflation. Defs.' Mem., Appellants' App. at 119. Plaintiffs submitted evidence that approximately 25% of a facility's costs were subject to historical inflation. Pls.' Resp. to Questions, Appellants' App. at 242. Testimony at the preliminary injunction hearing indicated that approximately 30% of a facility's costs were subject to historical inflation. Tr. of Hr'g, Appellants' App. at 350-51
 
 
 [9]
 Defendants submitted evidence that approximately 59% of the allowable costs of a facility are salaries, most of which are subject to estimated inflation. Defs.' Mem., Appellants' App. at 119. Plaintiffs presented evidence that approximately 60% of facility costs are subject to estimated inflation. Pls.' Resp. to Questions, Appellants' App. at 242. Testimony at the preliminary injunction hearing indicated approximately 70% of a facility's costs were subject to estimated inflation. Tr. of Hr'g, Appellants' App. at 350-51
 
 
 [10]
 The 0.4% figure was derived by taking the annual inflation rate as projected for 1992, 5.2%, dividing it by twelve and rounding it down to the nearest tenth of a percentage point
 
 
 [11]
 As the district court stated:
 The incentive factor is a per diem add-on ranging from zero to fifty cents. It is based upon administrative costs and plant operating costs minus real and personal property taxes. Providers with the lowest 30% of such costs receive a $.50 incentive factor. Providers with the highest 25% of such costs receive no incentive factor. Incentive factors of $.40 and $.30 are given to providers between the 30% and 75% range of costs.
 Kansas Health Care Ass'n, 822 F.Supp. at 692.
 
 
 [12]
 HCFA has 90 days from submission of the state's "assurances" to determine whether it approves a state's plan. 42 C.F.R. Sec. 447.256(b). If it fails to act within the 90 days, the plan is deemed approved. Id
 
 
 [13]
 The interim rate was the "current reimbursement formula" with certain changes: "[t]he actual rate of inflation, according to the DRI index for the nursing home industry, for the period from July 1, 1991 to December 31, 1992, shall serve as the historical and future (or "estimated") inflation factors applied to allowable reported costs. In addition, the future inflation period shall be extended to the midpoint of the rate-paying year." Order, Appellant's App. at 332. The allowable costs to which the inflation adjustments were made were not changed
 
 
 [14]
 Defendants do not challenge the district court's conclusions regarding the balance of harm and the public interest
 
 
 [15]
 Indeed, an expert testified that Kansas has an extremely high percentage of private-pay patients, as compared to Medicaid patients. As a result, Kansas has a very high rate of cross-subsidization of private-pay patients for Medicaid patients. Tr. of Hr'g, Supplemental App. at 172, 176-77, 183. For that reason, the expert opined, the number of bankruptcies or nursing home failures is not necessarily an accurate indication of the adequacy or inadequacy of Medicaid reimbursement rates
 We do not believe the fact that many facilities can subsidize Medicaid underreimbursement should undermine plaintiffs' claim of injury from such underreimbursement. Under that analysis, a wealthy individual would never be able to prove monetary injury, on the theory that such an individual could always in fact subsidize any such injury through his or her other sources of wealth.
 
 
 [16]
 As we acknowledged in AMISUB, a "state agency's determination of procedural and substantive compliance with federal law is not entitled to the deference afforded a federal agency." 879 F.2d at 796
 
 
 [17]
 We disagree with the defendants that the district court opinion failed to adequately discuss and explain its holding that there was a substantive violation of the Boren Amendment. It discussed at some length the adequacy of the reimbursement rates
 Further, as defendants acknowledge, a plaintiff may obtain injunctive relief for a procedural violation provided that violation results in or causes the substantive harm the statute was designed to prevent. See Hancock v. Montgomery Ward Long Term Disability Trust, 787 F.2d 1302, 1308 (9th Cir.1986) ("Substantive remedies are available for procedural defects ... only when the defects 'caused a substantive violation or themselves worked a substantive harm.' ") (quoting Ellenburg v. Brockway, Inc., 763 F.2d 1091, 1096 (9th Cir.1985)). Cf. Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 545, 107 S.Ct. 1396, 1404, 94 L.Ed.2d 542 (1987) (substantive harm is not presumed from procedural violation alone; harm must be proven). We are not presuming harm merely from a procedural violation of the Boren Amendment, as Village of Gambell forbids. Moreover, in our view, the procedural "findings" requirement of the Boren Amendment is designed to insure that a state devises substantively reasonable and adequate rates, and substantial procedural violations will often in fact lead to the substantive harm the statute is designed to avoid.
 
 
 [18]
 We do not suggest that an inflation adjustment must insure that "rates will increase in lock step with industry costs." Gibbs, 838 F.Supp. at 916. However, a state may not arbitrarily and without study or explanation reduce its inflation adjustment in a manner that virtually guarantees underreimbursement even for economically and efficiently operated facilities. See id. at 901 n. 11 ("The Court does not hold, nor does it mean to suggest, that a system designed in advance to reimburse only 86% of the industry's aggregate costs satisfies the Boren Amendment.")