The FUND FOR ANIMALS, a corporation of the State of New York, et al., Appellants,

v.

Kent FRIZZELL, Secretary of the United States Department of the Interior, et al.

No. 75–2054.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 18, 1975.

Decided Dec. 24, 1975.

As Amended Jan. 9, 1976.

John N. Malyska, Newark, N.J., for appellants.

Robert A. Kerry, Atty., Dept. of Justice, with whom Carl Strass and Irwin L. Schroeder, Jr., Attys., Dept. of Justice, Washington, D.C., were on the brief for Federal appellees. Edmund B. Clark, Atty., Dept. of Justice, Washington, D.C., also entered an appearance for Federal appellees.

Charles S. Fax, Washington, D.C., with whom Paul A. Lenzini, Washington, D.C., was on the brief for appellee intervenors International Ass'n of Game, Fish and Conservation Commissioners, and others.

Jay D. Fischer, of the bar of the Supreme Court of New Jersey, pro hac vice by special leave of court for appellee intervenor National Society for Conservation and Animal Protection.

Richard W. Snowdon, was on the brief for appellee intervenor National Rifle Association. Frederick J. Tansill, Washington, D.C., also entered an appearance for appellee intervenor National Rifle Ass'n.

Before WRIGHT, TAMM and Mac-KINNON, Circuit Judges.

PER CURIAM:

This is an appeal from an order of the district court denying appellants' motion for a preliminary injunction against those parts of the regulations promulgated by the United States Fish & Wildlife Service (FWS) which permit hunting in the Atlantic Flyway states of the greater snow goose[1] and the Atlantic brant during a limited season in 1975–76.[2] The

---

1. This is not to be confused with the lesser snow goose, which is the most numerous goose on the North American continent. 40 Fed.Reg. 34363 (Aug. 15, 1975). The greater snow goose has been the subject of increasing complaints of crop depredation and habitat destruction since 1970. 40 Fed.Reg. 34363 (Aug. 15, 1975). In its New Jersey wintering grounds, the snow goose has been responsible for ravaging cordgrass marshes that are highly productive of salt marsh snails, often uprooting whole plants to eat the roots or tubers in addition to the stems. The feeding and routing in the marshes has become so concentrated and severe that once a marsh has been eaten out, it does not recover as it would have in the past. Rather, the marshes change to open water ponds with no vegetation or to a vast expanse of a plant like woolgrass which does not provide the volume of desirable wildlife food which the marshes had once supplied. The New Jersey hay crop and the winter wheat crops in the coastal regions of Virginia and North Carolina have also been damaged by extensive grazing or clipping by the greater snow goose. See generally Brief for Intervenor International Ass'n. of Game, Fish & Conservation Comm'rs. at 21–23.

2. The final regulations for the 1975–76 national hunting season on migratory wildfowl appear at 40 Fed.Reg. 44709–23 (Sept. 29, 1975).

facts are generally set forth in the opinion of the district court and except as they relate to our discussion of the issue on appeal need not be repeated here, although it is significant and should be noted that appellants' counsel at oral argument admitted that "as a practical matter the seasons are pretty well over now." Appellants here contend that the trial judge erred in rejecting their arguments that the 1975–76 regulations were enacted in violation of law (1) because no Environmental Impact Statement (EIS) had been prepared as allegedly required by the National Environmental Policy Act of 1969, 42 U.S.C. § 4332 (1970), and (2) because the rulemaking procedure leading to the adoption of the regulations allegedly deprived them of their right to due process by allowing an insufficient period to comment on the proposed rules. Although the latter argument is not without merit, we nonetheless affirm the decision of the district judge.

## I.

As a result of earlier litigation brought by a number of appellants in this case,[3] the Secretary of the Interior agreed to prepare an overall programmatic EIS on the sport hunting of migratory birds. See Stipulation and Order of Dismissal, *Fund for Animals, Inc. v. Morton* (No. 74–1581, D.N.J.1974).[4] As early as May 5, 1975 in the "Notice of

Proposed Rulemaking . . . relating to the establishment of migratory bird hunting regulations for the United States for the 1975–76 season . . . ." which was duly published in the Federal Register, it was stated with respect to the "Atlantic Flyway":

Closed season to continue for blue and snow geese and brant *pending further evaluation of the status of these species.*

40 Fed.Reg. 20091 (emphasis added). This same notice stated:

However, because of the late date at which necessary data becomes available, it is anticipated that the comment periods on hunting regulation frameworks pertaining to shore and upland migratory game birds and waterfowl will necessarily be abbreviated.

40 Fed.Reg. 20090.

The Environmental Impact Statement, which was filed on June 6, 1975,[5] made only passing reference to snow geese and Atlantic brant, stating:

The hunting season for brant along the Atlantic Flyway was closed in 1972 following heavy harvest in 1971 and two consecutive years of poor breeding success due to adverse weather conditions. The 1973 wintering inventory recorded 42,000 brant (Files, Office of Migratory Bird Management, Laurel, Md.). Immatures per adult increased to 1.47 in the 1973 fall flight and the

---

The hunting of greater snow geese has not been permitted in this country since 1931, when the population had fallen to 7,000 birds. 40 Fed.Reg. 34362 (Aug. 15, 1975). Hunting of the Atlantic brant was discontinued after the 1971 season because two years of poor reproduction and a heavy harvest by hunters (attributable to a shift in the feeding grounds of the birds) had depleted the population, which fell to a low of 40,700 in 1973. App. 78. At oral argument, counsel for the Government in response to a question stated that a population of approximately 100,000 birds in the fall flight is required before hunting is feasible. For Atlantic brant in the Atlantic Flyway, *see also* Department of the Interior, Final Environmental Impact Statement for the Issuance of Annual Regulations Permitting the Sport Hunting of Migratory Birds 190–91 (filed June 6, 1975). Preliminary figures for the 1975 fall flight of snow geese predicted a population of 175,000 birds (App. 54). This prediction might have

been altered if subsequent breeding conditions had proved adverse. However, the latest census filed with this court shows that population to have been approximately 190,000 birds. *See* note 11 *infra*. The preliminary predictions on the Atlantic brant population were for a flight possibly in excess of 150,000 birds, but later figures revealed the actual flight to have been closer to 120,000 birds. *See* note 11 *infra*.

3. *Fund for Animals, Inc. v. Morton* (No. 74–1581, D.N.J.1974).

4. The Stipulation appears at App. 25–28.

5. Department of the Interior, Final Environmental Impact Statement for the Issuance of Annual Regulations Permitting the Sport Hunting of Migratory Birds (filed June 6, 1975). This document will hereafter be cited as FEIS.

wintering population rose to 88,000. *Several consecutive years of good production may be required before the Atlantic brant population reaches a level when hunting is again permitted.*

The season on the greater snow goose is closed in the Atlantic Flyway. At the present time they are hunted only in Canada. The population has increased considerably in recent years, and the increase appears to be continuing. This species winters chiefly in a relatively restricted area in coastal Virginia and North Carolina and there is a growing tendency among these birds to feed on agricultural croplands, and depredation complaints have increased in recent years. *A proposal by the Atlantic Flyway Council for limited hunting in a portion of the wintering range is currently under study.*

FEIS at 111 (emphasis added). When census figures gathered from the Atlantic brant breeding grounds in the spring of 1975 subsequently indicated that a population of huntable numbers existed (App. 78), FWS apparently began consideration of a proposal for opening a hunting season on brant in 1975 also. The proposals for hunting of greater snow geese and Atlantic brant were then publicly discussed along with other proposed regulations at a meeting on July 28–31 of the Atlantic Flyway Council in Atlantic City, New Jersey, and at a meeting on August 5th of the Waterfowl Advisory Committee of the FWS in Washington, D. C. Although notice in the Federal Register was given for the latter meeting, the notice did not state specifically that the snow goose and brant proposals would be considered.[6]

On August 15, 1975, proposed federal hunting regulations, including those on the greater snow goose and the Atlantic brant, were published in the Federal Register.[7] 40 Fed.Reg. 3361–68 (Aug. 15, 1975). In that announcement the public was also notified for the first time that draft Environmental Assessments [8] on the proposed resumption of hunting of the two species (which concluded that no EIS was required) had been prepared and were then available on request. Comments on the proposed regulations were solicited, but were required to be received by the agency before August 25, 1975. Despite the limited time, thirty comments were received on the proposed final 1975–76 rules for the nation. 40 Fed.Reg. 41097 (Sept. 5, 1975). Of the seven appellants here it is asserted that only one (D.E.E.R., Inc.) did not submit any comment. Government Brief at 8 n.8. The rest of the appellants did comment,[9] and a discussion of the general comments received from all parties

6. Public notice of the August 5 meeting of the FWS Waterfowl Advisory Committee was given on July 10, 1975:

*Purpose of meeting.* The Committee will review the staff recommendations of the United States Fish and Wildlife Service for 1975–76 waterfowl regulations, and present to the Director their recommendations for 1975–76 waterfowl season frameworks.

This meeting will be open to the public. Persons wishing to attend should notify the Director, United States Fish and Wildlife Service, U. S. Department of the Interior, Washington, D. C. 20240, or call AC 202–343–8827. Statements of interested persons other than Committee members must be filed in writing with the Director before or after the meeting. To the extent time permits, the chairman of the meeting will accept brief oral statements from the public at the close of the Committee's agenda providing that such statements are also submitted in writing before or after the meeting."
40 Fed.Reg. 29096.

7. Several of the appellants had been mailed advance copies of the regulations on August 8. Government Brief at 7. Counsel for appellants contended at oral argument that at least one appellant received no advance notice of the rules and in fact submitted no comments on the proposed regulations. Appellants' Brief at viii.

8. The purpose of these documents was to explain the agency's position that no formal EIS would be required on these two species beyond the overall FEIS filed on June 6. Hereafter, both assessments will be cited by the page of the Appellants' Appendix, in which they appear.

9. The appellants assert that their comments were prepared without the benefit of the Environmental Assessments, and were submitted hastily only to avoid a possible exhaustion of administrative remedies argument. Appellants' Brief at viii.

was published in the Federal Register on September 5, 1975. 40 Fed.Reg. 41096. The final regulations were published on September 29, 1975. 40 Fed.Reg. 44710–44715.

## II.

■ In order to be entitled to the extraordinary relief of a preliminary injunction, a party must demonstrate

a substantial likelihood of success on the merits and that irreparable harm would flow from the denial of an injunction. In addition, the trial judge must consider the inconvenience that an injunction would cause the opposing party, and must weigh the public interest as well.

*A Quaker Action Group v. Hickel*, 137 U.S.App.D.C. 176, 181, 421 F.2d 1111, 1116 (1969). *See also Jones v. District of Columbia Redevelopment Land Agency*, 162 U.S.App.D.C. 366, 373–74, 499 F.2d 502, 509–10 (1974). The district judge specifically found that a likelihood of success on the merits had not been demonstrated, that the proposed seasons would "result in an insignificant diminution of the populations," and that the interests of both the defendants-appellees and the public would be adversely affected (App. 36). For our purposes on appeal, however, it is sufficient to note that he was correct in finding no irreparable injury and thus did not abuse his discretion in denying the motion.

In the overall FEIS on the issuance of annual hunting regulations for migratory birds it was concluded that generally *habitat* rather than hunting is the primary limiting factor on migratory bird populations, and that properly regulated hunting can insure a population capable of respondent to habitat conditions during the following breeding season to build the population back from hunting losses to preharvest levels:

Research and experience have demonstrated that habitat is the key factor limiting most, if not all, migratory bird populations.

The goal in harvest regulation is to make certain that the removal by hunting is not in itself the factor limiting the capability of the population to respond to its available habitat the following year.

(FEIS at 185)

\* \* \* \* \* \*

The impact of hunting upon migratory game birds is not clear because their mobility makes it difficult to assess the structure of discrete population segments throughout the year. However, experience gained over a number of years has shown that regulated harvest generally does not cause long-term population reductions. This is further substantiated by harvest rates, band recovery rates and annual monitoring of waterfowl populations.

. . .

Hunting mortality causes a temporary reduction in the population. The amount of reduction varies from group to group and between species. . . The reduction in populations as a result of hunting is generally short-term. Given adequate habitat conditions most species are capable of building populations back to preharvest levels during the next breeding season.

(FEIS at 192)

\* \* \* \* \* \*

### Summary

The overall effect of annual regulations is to permit harvest of waterfowl which results in a temporary annual reduction in these populations. Regulations constrain this reduction so that the populations will be capable of responding to habitat conditions during the following breeding season and, with the possible exception of the black duck, result in no long-term decrease in the population.

(FEIS at 194)

These general conclusions were found applicable to the greater snow goose (App. 59) and the Atlantic brant (App. 81) in the separate Environmental Assessments prepared on those species. Therein, the FWS predicted that less than 10,000 snow geese, or from 10 to 15

percent of the fall flight, and 10,000 Atlantic brant, or three to six percent of the fall flight, would actually be harvested.[10] Those figures appear to have been reasonably accurate.[11] Both Environmental Assessments found that no irreparable damage would be caused by the predicted harvest (App. 55, 81). Possible injury from the hunt to other waterfowl species, habitat, hunters, the non-hunting public, the economy, private landowners, state administration, energy consumption, and other countries was considered and discounted (App. 55–58, 81–85).

■ Against this careful analysis, the appellants have made only nonspecific claims of "the destruction and loss of wildlife." [12] We cannot accept their extreme contention that the loss of only one bird is sufficient injury to warrant a preliminary injunction; rather, a proponent of such an injunction must raise a substantial possibility that the harvest of excessive numbers of these waterfowl will irretrievably damage the species. To equate the death of a small percentage of a reasonably abundant game species with *irreparable* injury without any attempt to show that the well-being of that species may be jeopardized is to ignore the plain meaning of the word. Since appellants have made no attempt to show that irreparable harm will result from the regulations in question here, and since appellees have demonstrated in detail that no such injury is likely, and that none is occurring (*see* Blandin affidavit, *supra* note 11), a preliminary injunction is not justified. Of particular significance is the inclusion in the regulations of a provision whereby the hunting of brant or greater snow geese, or both, could be stopped within 48 hours if the Service's predictions prove wrong and significant damage to the populations seems likely to result.

[3] Our conclusion that an injunction should not issue is bolstered by the delay of the appellants in seeking one. Although public notice that the comment period would end on August 25th was given on August 15 (and certain of the appellants were mailed advance copies of the regulations on August 8), an injunction against the proposed regulations was not sought until September 29, when the instant action and a motion for a temporary restraining order was filed in district court with respect to the final regulations published on that same date. So far as any right to an injunction *pendente lite* based on a due process claim is concerned, appellants knew on August 15th that what they allege to be their right to a more extensive comment period was to be denied them. Yet they delayed bringing any action until 44 days later, when the final regulations were issued. We find this delay to be inexcusable. Moreover, an injunction would be all but futile at this time, since the harvest of these birds as a practical matter was admitted to be "pretty well over" on the day the case was argued in

---

10. App. 55, 81.

11. Current figures filed by FWS in an affidavit dated Dec. 17, pursuant to an order entered by this court to assist it in the disposition of this case, indicate that the snow goose population in the fall flight down the Atlantic Flyway is probably in excess of 190,000 birds, and that samples show an expected harvest of 1,500 birds in New Jersey. Based on traditional harvest experience, this is well within the Service's predicted maximum harvest. Affidavit of Warren Blandin, FWS Migratory Bird Coordinator for the Atlantic Flyway (Dec. 17, 1975). Although the affidavit contains no current figure for the total flight population of Atlantic brant, at oral argument this number was said to be 120,000 birds. This is less than 150,000 predicted but still well above the minimum of 100,000 considered to be the population required for them to be safely hunted. *See* note 2 *supra*. The affidavit states that 8,000 Atlantic brant have been killed in New Jersey, where the season closed on December 9. The New Jersey harvest is typically 75 to 80 percent of the total harvest of Atlantic brant from the Atlantic Flyway; thus, FWS can predict from the 8,000 bird New Jersey take that the hunt is proceeding reasonably close to prediction and also that it will be the lowest harvest of these birds since 1957. Affidavit of Warren Blandin, *supra*.

12. Appellants' Brief at 30.

this court.[13] The current figures, submitted on December 17 pursuant to an order of this court, show that no irreparable harm is in fact occurring.[14] Under these circumstances, we see no justification for reversing the district court, and the facts do not support a claim that the FWS should exercise its 48-hour closing option.

### III.

 It should not be implied from our disposition of this case that we are in entire agreement with the actions of the Fish & Wildlife Service and with the decision of the district court in this matter.[15] We are principally concerned with the short comment time.

Due process in the form of adequate notice of a proposed rulemaking is assured by section 553 of the Administrative Procedure Act, 5 U.S.C. § 553 (1970). Specifically the statute provides that general notice of proposed rulemaking shall be published in the Federal Register. This means that a reasonable notice shall be given, though of necessity the period must be subject to some flexibility. The statute recognizes this need when it provides:

\* \* \* \* \* \*

(b)

Except when notice or hearing is required by statute, this subsection [requiring general notice of rulemaking] does not apply—

\* \* \* \* \* \*

(B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

5 U.S.C. § 553(b)(B). Despite this statute and its possible application to the circumstances surrounding the issuance of the instant regulations, the FWS did give notice of its proposed rules and did provide for public procedures, thus complying with the strict language of section 553. It recognized, however, that it must support the reasonableness of its action in providing the short notice for comments, and therefore set forth in the

**13.** MIGRATORY BIRD HUNTING

40 Fed.Reg. 44713–14 (Sept. 29, 1975)

| | Atlantic Brant | Snow Geese (Including Blue) |
|---|---|---|
| Conn. | Dec. 12 to Jan. 10 | Oct. 15 to Nov. 1; Dec. 10 to Dec. 20 |
| Delaware | Nov. 14 to Dec. 13 | Nov. 14 to Dec. 13 |
| Florida | Not listed | (closed) |
| Georgia | Dec. 22 to Jan. 20 | Dec. 22 to Jan. 20 |
| Maine | Nov. 10 to Dec. 9 | Oct. 8 to Nov. 1 |
| Maryland | Dec. 19 to Jan. 17 | Dec. 19 to Jan. 17 |
| Massachusetts | Nov. 10 to Nov. 22 Dec. 11 to Dec. 22 | (closed) |
| N.H. | Nov. 19 to Dec. 18 | Nov. 19 to Dec. 18 |
| N.J. | Nov. 10 to Dec. 9 | Nov. 10 to Dec. 9 |
| N.Y. | | |
| Long Island | Nov. 19 to Dec. 18 | Nov. 19 to Dec. 18 |
| Lake Champlain | Nov. 10 to Dec. 9 | Nov. 1 to Nov. 30 |
| Upstate | Nov. 10 to Dec. 9 | Nov. 10 to Dec. 9 |
| N.C. | Dec. 16 to Jan. 14 | Dec. 16 to Jan. 14 |
| Penna. | Nov. 10 to Dec. 6 | Oct. 15 to Nov. 13 |
| R.I. | Nov. 12 to Dec. 11 | Nov. 12 to Dec. 11 |
| S.C. | Dec. 19 to Jan. 17 | Dec. 19 to Jan. 17 |
| Vt. | Nov. 10 to Dec. 9 | Nov. 1 to Nov. 30 |
| Va. | Nov. 12 to Dec. 11 | Dec. 16 to Jan. 14 |
| W.Va. | (closed) | Dec. 17 to Jan. 15 |

**14.** *See* note 11 *supra* and accompanying text. **15.** We do find that the trial judge was correct

August 15th published notice the reasons it considered as requiring it to allow only an abbreviated comment period:

> Special circumstances are involved in the establishment of these regulations which limit the amount of time which the Service can allow for public comment. Specifically, two considerations compress the time in which the rulemaking process must operate: the need, on the one hand, to establish final rules at a point early enough in the summer to allow affected State agencies to appropriately adjust their licensing and regulatory mechanisms, and, on the other hand, the lack, before late July, of specific, reliable data on this year's status of waterfowl, coots, and gallinules. However, it is the policy of the Department of the Interior, whenever practicable, to afford the public an opportunity to participate in the rule making process. Accordingly, interested persons may submit written comments, suggestions, or objections with respect to the proposed amendments to the Director (FWS/MBM), U.S. Fish and Wildlife Service, U.S. Department of the Interior, Washington, D.C. 20240. All relevant comments received no later than August 25, 1975, will be considered.

40 Fed.Reg. 34363. Subsequently, in the final regulations published on September 29, 1975, the FWS took cognizance of 5 U.S.C. § 553(d)(3), which provides:

> The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except—

> \*　　\*　　\*　　\*　　\*　　\*

(3) as otherwise provided by the agency for good cause found and published with the rule.

5 U.S.C. § 553(d)(3). Compliance with this provision designed to assure public notice of agency action was intended by the following recital in the published regulations:

> The Fish and Wildlife Service is of the view that, although the rulemaking process for migratory bird hunting must, by its nature, operate under severe time constraints, every attempt should be made to give the public the greatest possible opportunity to comment on the regulations; thus, when the August 15, 1975 (40 FR 34361) and August 21, 1975 (40 FR 36572) proposed rulemakings were published, the Service established what it believed were the longest periods possible for public comment. In doing this, the Service recognized that at the period's close, time would be of the essence. That is, if there were a delay in the effective date of these regulations after this final rulemaking, the Service is of the opinion that the printing and distribution of Federal and State regulatory announcements would be delayed to the extent that hunters would not have these regulatory announcements in time for the beginning of the hunting seasons. The Service therefore finds that "good cause" exists, within the terms of 5 U.S.C. 553(d)(3) of the Administrative Procedure Act, and these regulations will therefore take effect immediately upon publication.

40 Fed.Reg. 44711 (Sept. 29, 1975).

 We recognize that the FWS gave some notice that an open season on

in holding that the requirements of *Maryland-National Capital Park & Planning Comm'n v. United States Postal Service*, 159 U.S.App.D.C. 158, 168–69, 487 F.2d 1029, 1039–40 (1973), have been complied with and that the FWS has thus made an adequate showing that the impact of these regulations on the human environment is insignificant. No EIS was therefore required.

Nor were appellants entitled to demand that an EIS be prepared under 40 C.F.R. § 1500.-6(a) (1975), which requires an EIS to be prepared "in all cases" where the action in ques-

tion "is likely to be highly controversial." The regulations do not define "highly controversial," but certainly something more is required besides the fact that some people may be highly agitated and be willing to go to court over the matter. Here, appellants have offered no evidence to substantiate their claim that this action is highly controversial. Cf. *Nucleus of Chicago Homeowners Assn. v. Lynn*, 524 F.2d 225, 232 (7th Cir. 1975) (construction of low income housing in a middle class neighborhood is not highly controversial).

greater snow geese was not a closed subject on May 5th and June 6th, when it issued the comments above referred to (*see* pages 4–5 *supra*) in the Notice of Proposed Rule Making and in the FEIS at 111. The May 5th comment with respect to the possibility of opening the season on brant was not as open-ended as that on snow geese, but nevertheless it also did state that the closed season on brant and snow geese was to continue "*pending further evaluation of the status of these species.*" The subject was also discussed at the public meeting of the Atlantic Flyway Council on July 28th to the 31st. It is a vital part of appellants' business to be knowledgeable in this field, and they closely follow the activities of the federal administrative agencies insofar as they relate to all aspects of migratory wildfowl. It is thus hard for us to conclude in view of the public statements released by the FWS on May 5th and June 6th that appellants did not have some notice before August 15th of the proposed action by the agency. Nevertheless, a fundamental requirement of reasonable notice must be met, and the comment period here *was* short. It is our view that in like circumstances in the future the agency should give firmer notice when it has similar matters under consideration and should set forth the general standards it intends to apply in making its decisions. We are in general agreement with the observation of Judge Lacey in his opinion in *Fund for Animals v. Frizzell*, Civ. No. 75–1721 (D.N.J., Oct. 7, 1975), to the effect that the FWS should make known its position to interested parties and the public as to material changes in hunting regulations in a manner consistent with the information available to it when there develops a possibility of an open season on species previously closed to hunting.[16] While the record does not clearly so indicate, we feel there is a strong possibility that the comments made on May 5th and June 6th could have been more enlightening and specific.

## IV.

In summary, though we affirm the denial of a preliminary injunction, we express no opinion on the merits. We thus leave to the trial court to determine in the first instance the procedural validity of the initial decision to open the seasons and whether proper standards were applied. The determination of these issues should have a definite bearing on the procedures to be followed in the future in adding species to the list of those to be hunted in a given year.

*Affirmed.*

---

16. For the heart-rending story of a snow goose that strayed from the Atlantic Flyway, *see* P. Gallico, *The Snow Goose* (Knopf, 1941).