**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 20 2003**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

GREATER YELLOWSTONE COALITION;
JACKSON HOLE CONSERVATION
ALLIANCE,

        Plaintiffs - Appellants,

    and

SNAKE RIVER FUND,

        Plaintiff - Intervenor,

  v.

ROBERT B. FLOWERS, Commander and
Chief of Engineers, United States Army
Corps of Engineeers, in his official
capacity; KURT F. UBBELOHDE,
District-Engineer of Omaha District,
United States Army Corps of Engineers, in
his official capacity; CANYON CLUB
INC., a Wyoming corporation,

        Defendants - Appellees.

No. 02-8087

---

**Appeal from the United States District Court**
**for the District of Wyoming**
**(D.C. No. 02-CV-1036-D)**

---

Timothy J. Preso (Douglas L. Honnold on the briefs), Bozeman, Montana, for the
Plaintiffs-Appellants.

Aaron P. Avila (Gary M. Henningsen and Stanley E. Tracey, U.S. Army Corps of Engineers, Omaha, Nebraska; Matthew H. Mead, United States Attorney; Thomas L. Sansonetti, Assistant Attorney General; Carol A. Statkus, Assistant United States Attorney; Jon Lipshultz and Ellen Durkee, Attorneys, United States Department of Justice, Environmental & Natural Resources Division with him on the brief), United States Department of Justice, Environmental & Natural Resources Division, Washington, DC, for the Defendants-Appellees.

Richard W. Walden (Franklin J. Falen and Marc R. Stimpert with him on the brief), Budd-Falen Law Offices, P.C., Cheyenne, Wyoming, for the Defendant-Appellee Canyon Club, Inc.

---

Before **SEYMOUR**, **HENRY** and **LUCERO**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

---

This case involves a proposal to construct an eighteen-hole golf course and residential development along the Snake River in Wyoming, an area that provides important nesting and foraging habitat for the bald eagle, a threatened species. Two environmental groups, the Greater Yellowstone Coalition and the Jackson Hole Conservation Alliance (collectively, the "plaintiffs"), challenge the Army Corps of Engineers' ("Corps'") issuance of a permit under section 404 of the Clean Water Act ("CWA"), 33 U.S.C. § 1344, to Canyon Club, Inc. ("Canyon Club") allowing development of the project. Plaintiffs seek a preliminary injunction to halt the proposed development, pending resolution of its challenge to the issuance of the permit under the CWA and the National Environmental

Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq.  Plaintiffs claim that the project will cause irreparable harm to three bald eagle nesting territories.  Finding no irreparable harm and concluding that the plaintiffs were unlikely to succeed on the merits, the district court denied the motion for a preliminary injunction.  We exercise jurisdiction pursuant to 28 U.S.C. § 1292(a)(1) and reverse.

## I

Richard Edgcomb, the president and general manager of Canyon Club, owns a parcel of land adjacent to the Snake River in Wyoming known as the River Bend Ranch ("Ranch").  Edgcomb sold a portion of the Ranch to the Canyon Club for the purpose of building a golf course and residential development.  According to Edgcomb and the Canyon Club, the purpose of building the golf course was to provide additional income so that the remainder of the Ranch could remain viable as a ranching operation;[1] Edgcomb continues to own as Ranch property 544 acres adjacent to the Canyon Club property to the north and 125 acres some distance

---

[1] Edgcomb is not a party in the instant case, and there is no record evidence of a legal obligation tying the proceeds of the sale of a portion of the Ranch to the future operation of the remaining portion of the Ranch.  Moreover, because the question of whether supplementing operations on the remaining Ranch with income from the Canyon Club is a proper purpose of the project under the pertinent Acts bears on the merits analysis discussed in Part III of the opinion, we do not resolve or further address the question.

from the Canyon Club parcel to the south.[2]  The Canyon Club parcel is bounded on the west by the Snake River and on the east and south by national forest land.

Three bald eagle nesting territories are in the vicinity of the Canyon Club parcel:  the Martin Creek nest, the Dog Creek nest, and the Cabin Creek nest.[3] The Martin Creek nest, which has been inactive in recent years, lies to the west of the property, 230 feet from one of the proposed golf greens.  The Dog Creek nest is located near the river to the northwest of the Canyon Club development, approximately 1,000 feet from the tee box of one of the proposed golf holes.  This nest has been very productive, having produced at least one fledgling per year since 1992.  The Cabin Creek nest is situated to the south of the project area, 1,475 feet from one of the proposed tee boxes, with an alternate nesting site very close to the development.  Cabin Creek is the most productive nest in the Greater Yellowstone ecosystem, having produced eleven fledglings between 1992 and 2002.

In March 2001, Canyon Club applied to the Corps for a permit to build an eighteen-hole golf course and fifty-four home residential development on a 286-acre parcel of land originally part of the Ranch (the "March proposal").  Congress

---

[2]  A strip of national forest land separates the Canyon Club parcel from the southern 125 acres of Ranch property.

[3]  There is a fourth nest, the Elbow nest, approximately 2.8 miles from the proposed development.  Plaintiffs do not allege that this nest will be harmed by the proposed development.

requires developers to obtain a section 404 permit from the Corps "for the discharge of dredged or fill material into . . . navigable waters," 33 U.S.C. § 1344(a). This project required the dredging and filling of waters under the Corps' jurisdiction, including the construction of twenty-three bendway weirs (river-bank stabilizing structures) to protect the golf course holes along the banks of the Snake River. Two of the proposed golf holes were to be built on a gravel peninsula extending into the river. When the project met with criticism from various state and federal agencies and environmental groups, and was determined not to be in compliance with Teton County Land Development Regulations ("LDRs"), the Corps recommended that Canyon Club withdraw and revise its proposal, and Canyon Club did so.

Canyon Club submitted a revised section 404 application in October 2001 (the "October proposal"). Like the March proposal, the October proposal envisioned an eighteen-hole golf course and residential development, but the number of homes was increased to sixty-six and the overall size of the parcel that would be the subject of development was increased to 359 acres. Changes were also made to bring the project into compliance with Teton County LDRs, such as moving two of the proposed golf holes off the peninsula extending into the river. Proposed impacts to wetlands were reduced, and proposed conservation easements were redesigned. A section 404 permit was necessary because the October

proposal, like the March proposal, required dredging and filling of wetlands and waters of the United States under the Corps' jurisdiction, including the possible construction of bendway weirs to protect the river banks.

At the Corps' request, Canyon Club prepared a Biological Assessment ("BA") of the proposed development, retaining Pioneer Environmental Services, Inc. ("Pioneer") for this purpose. This BA considered the impact of the proposed project on a number of species, including bald eagles, concluding that "[t]he proposed project <u>may affect and is likely to adversely affect</u> bald eagles" but would not adversely affect various other species. (2 Appellant's App. at 437.) In January 2002, Pioneer prepared a "Section 404(b)(1) Analysis" for the Corps, listing several alternatives to the proposal. (2 <u>id.</u> at 398.) This section 404(b)(1) analysis compared the October proposal to five alternatives: (1) the March proposal, (2) a nine-hole golf course, (3) a design that would relocate holes three and four of the proposed golf course, (4) no issuance of a section 404 permit, and (5) a "no action" alternative. (2 <u>id.</u> at 403–06.) Finally, in March 2002, Pioneer prepared an Environmental Assessment ("EA") that compared the proposal to each of these alternatives with the exception of (4).

In its EA, the most comprehensive document prepared for the Corps, Pioneer articulated the purposes and goals of the project:[4]

- Supplement the ranching operations on the River Bend Ranch with income from the Canyon Club golf development in order to protect the working ranch operations (horse and/or cattle).
- Preserve the adjacent working ranch and the rustic, natural character of the ranch throughout the project area.
- Develop a world-class, 18-hole, championship golf course of such quality that it will maximize real estate values and minimize the number of lot sales.
- Create a golf course with exceptional visual experiences and variety of play (in length and direction of holes).
- Minimize development sprawl and conceal human structures and the infrastructure of the golf course in order to preserve the scenic quality of the environment.
- Minimize tree removal, wetland impacts, and ground disturbance while optimizing conservation of open space.

(1 id. at 111.) Having thus defined the purposes of the project, Pioneer concluded that the "no action alternative" and the nine-hole golf course alternative failed to satisfy the project purposes. (1 id. at 121–24.) According to Pioneer, if the Corps did not issue a section 404 permit, the entirety of the Ranch would be sold to the Canyon Club, and a larger housing development without a golf course would be built on the parcel. The nine-hole golf course was rejected for lack of demand and failure to satisfy any of the enumerated project purposes. Finally, Pioneer explained that the original 286-acre proposal and the possible relocation

---

[4] We express no opinion on whether these are proper purposes for the Canyon Club development under NEPA and the CWA. See supra footnote 1.

of holes three and four would not be in compliance with Teton County LDRs. Under this analysis, the October proposal was the only alternative that both satisfied the purported purposes of the project and complied with local land development regulations.

On April 5, 2002, the Fish and Wildlife Service ("FWS") prepared a Biological Opinion ("BO") analyzing the likely effects of the October proposal on species listed as threatened or endangered under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 et seq. FWS concurred with Pioneer's BA that the proposed project would not adversely affect other species, but would likely affect bald eagles. Specifically, FWS determined that the project would result in increased human disturbance to the bald eagles and render their foraging habitat less suitable. Although it conceded that some bald eagles "could become moderately habituated to human presence or tolerant of certain activities along the Snake River," the BO stated that "[t]he Service anticipates the loss of 3 bald eagle nesting territories (i.e., Cabin Creek, Martin Creek, and Dog Creek) as a result of the proposed action." (1 Appellant's App. at 90–93.) FWS predicted that bald eagles displaced by the project would be forced to move into territory occupied by other bald eagles, and the reproductive output of 6 adult bald eagles would be lost. Nonetheless, FWS concluded that the development "is not likely to jeopardize the continued existence of the bald eagle," and recommended

mitigation measures to "minimize the impact of incidental take that might otherwise result from the proposed action."[5]  (1 id. at 92–96.)

The Corps prepared its own EA reviewing the October proposal.  Accepting the definition of the project purposes set forth by Pioneer, the Corps considered the alternatives suggested by Pioneer, and rejected them either because they did not satisfy the purposes of the project or because they violated Teton County LDRs.  The Corps also considered two off-site alternatives on ranchland not owned by Edgcomb or Canyon Club, but rejected these sites as too expensive to purchase and likely to have a similar impact on wetlands.  Based on this analysis, the Corps concluded that the October proposal was "the least environmentally damaging practicable alternative available."  (2 id. at 526.)  The Corps further concluded that the "permit action will not have a significant impact on the quality of the human environment" and accordingly issued a Finding of No Significant Impact, declining to issue an Environmental Impact Statement under NEPA.  (2 id. at 546.)

On June 14, 2002, the Corps granted a section 404 permit to Canyon Club, thus allowing the October proposal to go forward.  Three days later, the plaintiffs

_____

[5]  Unauthorized "take" of a listed species is prohibited by the ESA.  16 U.S.C. § 1538(a)(1)(B) & (G); 50 C.F.R. § 17.31(a).  The term "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).

filed a petition in the Wyoming district court for review of the Corps' decision to issue a section 404 permit. Plaintiffs argued that the permit violated NEPA and the CWA, and that the issuance of the permit was arbitrary, capricious, and an abuse of discretion. Plaintiffs also moved for a temporary restraining order and a preliminary injunction to halt the proposed development.

A temporary restraining order against the project was issued by the district court, but it subsequently amended the order to allow limited construction pending its ruling on the preliminary injunction. On June 18, 2002 and July 3, 2002, the district court held a hearing on the motion for a preliminary injunction. At the hearing, the district court heard testimony from Edgcomb, various state and federal environmental officials, and the president of Pioneer. On August 16, 2002, the district court lifted the temporary restraining order, and three days later denied plaintiffs' motion for a preliminary injunction. Plaintiffs appeal this interlocutory order.

## II

We review a district court's denial of a preliminary injunction for abuse of discretion. Hawkins v. City & County of Denver, 170 F.3d 1281, 1292 (10th Cir. 1999). "An abuse of discretion occurs only when the trial court bases its decision on an erroneous conclusion of law or where there is no rational basis in the evidence for the ruling." Id. (quotation omitted). We examine the district court's

underlying factual findings for clear error and review its legal determinations de novo.  Davis v. Mineta, 302 F.3d 1104, 1111 (10th Cir. 2002).

A party seeking a preliminary injunction bears the burden of showing:  "(1) a substantial likelihood of prevailing on the merits; (2) irreparable harm unless the injunction is issued; (3) [that] the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) [that] the injunction, if issued, will not adversely affect the public interest."  Fed. Lands Legal Consortium ex rel. Robart Estate v. United States, 195 F.3d 1190, 1194 (10th Cir. 1999).  "If the plaintiff can establish that the latter three requirements tip strongly in his favor, the test is modified, and the plaintiff may meet the requirement for showing success on the merits by showing that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation."  Davis, 302 F.3d at 1111 (quotation omitted).  Because a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal.  Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Social & Rehab. Servs., 31 F.3d 1536, 1543 (10th Cir. 1994).

In the instant case, the district court found that the plaintiffs failed to satisfy the first two conditions:  (1) a likelihood of prevailing on the merits and (2) irreparable harm unless the injunction is issued.  The district court did not

address the other two factors, i.e., (3) the balance of harms and (4) the effect on the public interest. Because the appropriate standard for evaluating likelihood of success on the merits depends on whether the other three factors are satisfied, we begin by reviewing the district court's determination that plaintiffs had failed to show irreparable harm.

Two bases were articulated by the district court for its conclusion that the plaintiffs had not shown irreparable harm. First, the district court noted, "[p]laintiffs have made no showing that the well-being of the bald eagle species may be jeopardized by the challenged action, and certainly not before this Court has an opportunity to fully consider the merits of this case." Greater Yellowstone Coalition v. Flowers, No. 02-CIV-1036-D, slip op. at 4 (D. Wyo. Aug. 19, 2002) (order denying preliminary injunction). Second, the district court found the plaintiffs' "alleged injuries to be speculative." Id. We address these two findings.

**A**

Although the district court acknowledged that FWS anticipated the loss of three bald eagle nests and twelve juvenile bald eagles during the construction period, it nonetheless concluded that alleging harm to individual bald eagles was insufficient to justify a preliminary injunction. Citing Fund for Animals v. Frizzell, 530 F.2d 982 (D.C. Cir. 1976) and Bays' Legal Fund v. Browner, 828 F.

Supp. 102 (D. Mass. 1993), it held that a proponent of a preliminary injunction must show that the challenged action will irretrievably damage the entire species and that plaintiffs did not meet this burden.[6]

In Frizzell, the first case cited by the district court in support of its view, the D.C. Circuit concluded that a proponent of a preliminary injunction "must raise a substantial possibility that the harvest of excessive numbers of . . . waterfowl will irretrievably damage the species." Frizzell, 530 F.2d at 987. In Frizzell, however, the species of waterfowl in question was not threatened or endangered, and the petitioners were arguing that the destruction of "only one bird is sufficient injury to warrant a preliminary injunction." Id. Frizzell concludes that equating "the death of a small percentage of a reasonably abundant game species with irreparable injury without any attempt to show that the well-being of that species may be jeopardized is to ignore the plain meaning of the word." Id. (emphasis added).

In the instant case, the animals likely to be harmed by the proposed golf course development belong to a threatened species, not a "reasonably abundant game species." While harvesting a small percentage of an abundant game species

_____

[6] At oral argument, the Corps conceded that it is not necessary to show likely extinction of the species in order to show irreparable harm. Because Canyon Club did not make this concession, however, we consider the issue further.

will not result in a permanent decrease in the population, id. at 986–87, threatening or eliminating the primary breeding area for bald eagles in the Greater Yellowstone area would have a significant impact on that species in the area. Accordingly, Frizzell is not persuasive authority, and we consider it inapplicable given the distinguishing circumstances.

In Bays' Legal Fund, a district court case from Massachusetts cited below, the court determined that evidence of "irreparable harm" for purposes of a preliminary injunction could be used to support a substantive claim of a violation under the ESA, which requires a showing that a challenged federal action is likely to "jeopardize the continued existence of any endangered species . . . or result in the destruction or adverse modification of habitat of such species" under the ESA. 828 F. Supp. at 108 & n.13 (quotation omitted). The trial court in Bays' Legal Fund, however, was not faced with the question of what constitutes irreparable harm: rather, the court had to decide whether evidence of such harm could support a claim under the ESA standard.[7] Thus, the question presented in the instant case was not even before the court in Bays' Legal Fund, and its

_____

[7] The court in Bays' Legal Fund did conclude that "the two standards are sufficiently analogous to treat them equivalently." 828 F. Supp. at 108 n.13. However, because the court was faced only with the question of whether evidence of irreparable harm could be used to support an ESA claim, this statement is mere dicta for present purposes.

conclusions are not relevant to the case before us. In any event, we are not bound by rulings of the district courts, whether in or out of our circuit.

Plaintiffs contend that a proponent of a preliminary injunction under these circumstances, seeking to prevent harm to members of a threatened or endangered species, need not show harm to the species as a whole.[8] We agree. Contrary to the assumption of both the court in Bays' Legal Fund and the district court in the instant case, there is no reason why the ESA's language should govern the issue of irreparable harm. Plaintiffs have not brought an ESA challenge, and it would be preferable to base the determination of irreparable harm on the statutes that actually form the basis of plaintiffs' claims. For example, plaintiffs challenge the

---

[8] Plaintiffs cite several district court cases in support of this view, of which the most cogently reasoned and persuasive is Sierra Club v. Martin, 71 F. Supp. 2d 1268, 1327 (N.D. Ga. 1996). In Martin, the court found irreparable harm on the ground that the logging in question would "destroy certain sensitive plants and animals located in the timber project areas, as well as suitable habitats for these and other similar sensitive and endangered species in the two Forests." Id. at 1327.

Other cases cited by the plaintiffs do not clearly support their view. For example, Sierra Club v. Norton, 207 F. Supp. 2d 1310, 1340 (S.D. Ala. 2002), does indicate that harm to "individual members of the species" must be considered, but explains that the challenged action may lead to "loss of long-term viability of the species." Several other cases cited by the plaintiffs involve challenges to slaughter of individual bison, and are distinguishable insofar as the method of killing the bison—rather than the loss of individual bison—was the source of the harm to the plaintiffs. See, e.g., Fund for Animals v. Clark, 27 F. Supp. 2d 8, 14 (D.D.C. 1998).

issuance of the section 404 permit under the CWA[9]—regulations under that statute prevent "discharge of dredged or fill material . . . if there is a practicable alternative . . . which would have less adverse impact on the aquatic ecosystem." 40 C.F.R. § 230.10(a). This language does not differentiate between harm to individual animals and harm to the species as a whole: rather, it looks to the impact on the "aquatic ecosystem." According to the plaintiffs, eliminating bald eagles from the Snake River area would certainly have an "adverse impact on the aquatic ecosystem," as bald eagles are an important part of that ecosystem—and one bald eagle nest in particular, the Cabin Creek nest, is the most productive breeding territory in the Greater Yellowstone area.

We can find no compelling reason why the ESA language should serve as a benchmark for deciding whether plaintiffs have shown irreparable harm. By adopting the ESA standard, requiring that a plaintiff show damage to an entire species, as the standard for evaluating irreparable harm in a CWA or NEPA challenge, the district court based its decision on an erroneous conclusion of law. We conclude that, to the extent that the district court based its denial of a preliminary injunction on the plaintiffs' failure to establish harm to the species as a whole, this was an abuse of discretion.

---

[9] Plaintiffs also bring a challenge under NEPA. We focus on the CWA language merely to demonstrate that the ESA definition of harm is not dispositive in the instant case.

**B**

In addition to holding that plaintiffs failed to show harm to the species, the district court also found that, in any event, the injuries alleged by the plaintiffs were speculative. Consequently, we must also consider the district court's alternative ground for decision: that the possibility of harm to the bald eagles was too speculative to justify granting a preliminary injunction.

Both the district court and the defendants rely on cases from other circuits for the proposition that purely speculative harm does not amount to irreparable injury, see Forest City Daly Housing v. Town of N. Hempstead, 175 F.3d 144, 153 (2d Cir. 1999); Wis. Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985), a proposition with which this court agrees. Other cases, however, elaborate on the level of risk that is required for a showing of irreparable harm. These latter cases hold that an injury is not speculative simply because it is not certain to occur. An "irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages." Adams v. Freedom Forge Corp., 204 F.3d 475, 484–85 (3d Cir. 2000) (emphasis added); see also Lanier Prof'l Servs., Inc. v. Ricci, 192 F.3d 1, 3 (1st Cir. 1999) (stating that a plaintiff must show a "significant risk of irreparable harm" in order to obtain a preliminary injunction (emphasis added)); Associated Gen. Contractors of Cal., Inc. v. Coalition for Econ. Equity, 950 F.2d

- 17 -

1401, 1410 (9th Cir. 1991) (same). While not an easy burden to fulfill, Adams, 204 F.3d at 485, we nonetheless agree with those circuits that consider a significant risk of harm sufficient, and hold that a plaintiff who can show a significant risk of irreparable harm has demonstrated that the harm is not speculative.

In reaching the conclusion that the alleged harm to the bald eagles was merely speculative, the district court did not apply the "significant risk" standard. Thus, we proceed to examine the evidence to determine whether the plaintiffs have shown a significant risk of irreparable harm.

As discussed above, the BO prepared by FWS anticipated the loss of three bald eagles' nests.[10] The Corps relied on the conclusions of FWS in determining that the proposed development "may affect and is likely to adversely affect bald

---

[10] Plaintiffs argue that, in finding that the alleged injuries to the bald eagles were speculative in nature, the district court failed to give deference to the BO prepared by FWS. "[D]eference to agency action is appropriate where that action implicates scientific and technical judgments within the scope of agency expertise." Wyoming v. United States, 279 F.3d 1214, 1240 (10th Cir. 2002) (quotation omitted). It is not clear that deference to FWS is appropriate in this matter, however, as the present action does not arise under the ESA, the statute which FWS is responsible for administering, see 50 C.F.R. § 402.01(b). Cf. Sierra Club—Black Hills Group v. U.S. Forest Serv., 259 F.3d 1281, 1286 (10th Cir. 2001) ("[W]e defer to agency interpretation of congressionally delegated mandates." (citing Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843 (1984)). We need not decide this issue because, as discussed below, we conclude that the evidence at the hearing amply demonstrated that the proposed development posed a significant risk of harming bald eagles.

eagles." (2 Appellant's App. at 527.) Other documents that the Corps relied on in issuing the permit support FWS's determination that the Canyon Club project may harm bald eagles. For example, while the BA prepared by Pioneer ultimately concluded that negative effects on bald eagles could be "minimized by the implementation of mitigation measures and monitoring efforts" (1 Appellee's App. at 179), it also acknowledged that the project could harm the bald eagles in a variety of ways. Pioneer's BA admitted that "[t]here would be direct effects to bald eagles and their habitats in association with construction of the Canyon Club golf course and housing development. Disturbances associated with construction would be in the form of noise, human activities, ground disturbance, and tree removal." (2 Appellant's App. at 448.) The BA further stated that, while removal of trees would be minimized during construction, "potential perch, roost, and future nest trees could still be removed," and predicted that "[f]oraging habitat for the Dog, Martin, and Cabin Creek eagle pairs in the vicinity of the project area could be impacted indirectly by the proposed development." (2 id. at 448–49.) As to cumulative effects of the project, the BA stated that "[c]umulative impact to eagles within and adjacent to the Canyon Club project area could be realized over time because of the projected increase in recreational use of the project area and adjacent land by Club members, families, and guests." (2 id. at 450.)

At the hearing on the preliminary injunction, Robert J. Oakleaf, a wildlife biologist with the Wyoming Game and Fish Department, testified as to the impact that the Canyon Club project would have on the bald eagles. Oakleaf testified that, if the proposed development went forward, "out of the four pairs, four bald eagle nests that were there, we'd be lucky if one remained." (5 Appellant's App. at 895.) Oakleaf based this prediction on "the increase in human activity and the distribution of where it is," as well as the fact that the development would "remove . . . a significant amount of foraging habitat." (5 id. at 896.) Oakleaf predicted that the greatest threat was to the Martin Creek nest, "and then it's going to be a toss-up between the Dog Creek and Cabin Creek," but "we think that . . . three of the four pairs [of bald eagles] will disappear." (5 id. at 898.)

Oakleaf qualified this prediction by stating that "[i]t may take two years; it may take 20 years" for the bald eagles to leave the nests (5 id. at 901), and explained that the Department had not quantified the projected loss of bald eagles because "they don't like to be put hanging their hat on something that may or may not happen," (5 id. at 917). Oakleaf also acknowledged that, in some instances, bald eagles had been tolerant of human activity. Nevertheless, the thrust of Oakleaf's testimony was a prediction that the bald eagles would likely be harmed by the proposed Canyon Club development.

Patricia Ann Deibert, a fish and wildlife biologist for the Wyoming field office of FWS, testified that maintaining a 400-meter buffer zone around the nest "will protect the nest itself . . . [but] will not protect the foraging areas which are critical to the success of those nests during the breeding season." (5 id. at 1023.) Later, however, the court asked Deibert whether, if these buffer zones protect the nest sites, "those nest sites could remain viable places for reproduction of the species," and Deibert responded, "They could." (5 id. at 1025.) Deibert also confirmed that FWS's prediction of a loss of three bald eagle nests was "a worst-case scenario." (5 id. at 1016.) Even so, when asked about the mitigation measures proposed to protect the bald eagles, Deibert responded that "[i]t is still possible that three bald eagle nesting territories will be lost." (5 id. at 1021.) While Deibert left open the possibility that mitigation measures might save the bald eagles, she stood by FWS's position that the project would likely result in the loss of three bald eagle nests.

Roy Hugie, a wildlife biologist and president of Pioneer, was called by Canyon Club to address the potential impact of the proposed golf course on the bald eagles. Hugie was optimistic about the possibility that the bald eagles could adapt to the construction of the golf course and resulting increase in human activity. While Hugie conceded that the project could adversely affect the bald eagles, he considered it equally likely "that this project has the potential to either

maintain the status quo or perhaps develop a stronger food source than currently exists." (5 id. at 1089.)

Hugie further asserted that the "human intrusion" could be "controlled" by the design of the course and various mitigation measures. (5 id.) Hugie pointed to the example of the Elbow nest; although the nest is near a campground, the bald eagles have "habituated" to the human presence. (5 id. at 1076.) Nevertheless, despite these rosy predictions, Hugie conceded under cross-examination that he "wholly agree[d]" with the proposition that implementation of the project "has the potential to adversely affect bald eagles." (5 id. at 1089.)

Thus, all of the expert witnesses at the hearing, including Canyon Club's witness Hugie, acknowledged that there was a significant risk that the proposed development would harm the bald eagles, even if they qualified this by couching it in conditional terms. In order to determine whether this satisfies the irreparable harm requirement, however, we must further decide whether such harm is likely to occur before the district court rules on the merits. "Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered . . . . [I]f a trial on the merits can be conducted before the injury would occur there is no need for

interlocutory relief." 11A Wright, Miller & Kane, Federal Practice and Procedure § 2948.1, at 139–49.

If the plaintiffs alleged that the eagles would be harmed only by the use of the completed project, and not by its construction, this would be insufficient to justify a preliminary injunction in advance of the trial court's decision on the merits. However, the record shows that construction of the Canyon Club project itself poses a significant risk to the eagles. For example, FWS determined in its BO that

> [t]here will be direct effects to bald eagles and their habitats in association with <u>construction</u> of the Canyon Club golf course and housing development. <u>Disturbances associated with construction</u> would be in the form of <u>noise, human activities, ground disturbance, and tree removal</u> . . . . A maximum of 9.5 acres of forested habitat could be removed from proposed fairways during golf course construction. A maximum of 3.0 acres of forested habitat could be removed from proposed building envelopes during homesite construction.

(1 Appellant's App. at 86 (emphasis added).) While the FWS proposed mitigation measures to reduce these effects, it is evident that FWS considered the construction itself, as well as the later use of the development, to pose a direct threat to the eagles. Pioneer also acknowledged this threat in its BA, stating, "[t]here would be direct effects to bald eagles and their habitats in association

- 23 -

with <u>construction</u> of the Canyon Club golf course and housing development."  (1 Appellee's App. at 168 (emphasis added).)

At the hearing on the preliminary injunction, Edgcomb stated that construction on the Canyon Club project will resume in April of this year absent an intervening order from the court.  Edgcomb testified that in 2003 "our construction window would be from April through September."  (4 Appellant's App. at 729.)  In fact, some construction began last summer, and there is presently no legal impediment to restarting construction at any time.  In any event, because the district court gave no indication that it will rule on the merits in advance of the April target date for construction, plaintiffs have shown a significant risk that irreparable harm will occur before the district court decides the merits of this case.[11]

---

[11]  In its order, the district court stated that "[p]laintiffs have made no showing that the well-being of the bald eagle species may be jeopardized by the challenged action, and <u>certainly not before this Court has an opportunity to fully consider the merits of this case</u>."  <u>Greater Yellowstone Coalition,</u> No. 02-CIV-1036-D, slip op. at 4 (D. Wyo. Aug. 19, 2002) (order denying preliminary injunction) (emphasis added).  This statement, however, indicates only that plaintiffs have not shown irreparable harm will occur <u>to the species</u> before the district court rules on the merits.  The district court made no factual finding as to the likelihood that harm to individual bald eagles will occur before it rules on the merits.  While Canyon Club has submitted supplemental authority indicating that a hearing before the district court, which appears to be a hearing on the merits, is scheduled for February 26, 2003, there is no guarantee that the district court will issue a ruling on the merits before April.

Having reviewed the record under the proper standard, we conclude that there is no rational basis for a determination that plaintiffs failed to show irreparable harm. We conclude that the district court applied the wrong standard in evaluating whether the harm was speculative, and, under the correct standard, plaintiffs have shown a significant risk of irreparable harm. Accordingly, we hold that the district court abused its discretion in finding that the injury to the bald eagles was too speculative to justify preliminary injunctive relief.

**III**

As a further alternative ground for denying the preliminary injunction, the district court found that plaintiffs were unlikely to succeed on the merits. Because the district court also concluded that plaintiffs had failed to show irreparable harm, it did not take into consideration the special standard that we have enunciated for cases where a proponent of a preliminary injunction has established all of the factors save likelihood of success on the merits. If a plaintiff can show that all the factors except for likelihood of success on the merits tip strongly in its favor, "the plaintiff may meet the requirement for showing success on the merits by showing that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." Davis, 302 F.3d at 1111. This modification of the ordinary preliminary injunction standard was

adopted by our circuit nearly four decades ago in the case of <u>Continental Oil Co. v. Frontier Refining Co.</u>, 338 F.2d 780, 782 (10th Cir. 1964).

As discussed above, we have concluded that the plaintiffs satisfied the irreparable harm requirement in the instant case. Two inquiries remain: the district court did not address the balance of harms and the effect on the public interest. If plaintiffs are able to demonstrate that these other two factors weigh heavily in their favor, the district court must reevaluate its merits analysis under the less stringent standard we adopted in <u>Continental Oil Co.</u> It would be premature for this court to examine the likelihood of plaintiffs' success on the merits without knowing whether the two remaining factors are satisfied and without a determination of the resultant applicable legal standard that would govern the merits analysis.[12]

---

[12] We express no view on whether the plaintiffs have shown likelihood of success on the merits under either standard. We note, however, that the district court failed to address plaintiffs' claims under the CWA, focusing on their NEPA claims. NEPA requires that federal agencies "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). By contrast, the CWA regulations mandate that "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences," 40 C.F.R. § 230.10(a), and that "no discharge of dredged or fill material shall be permitted which will cause or contribute to significant degradation of the waters of the United States," § 230.10(c). The CWA regulations further state that, when the basic purpose of a

(continued...)

On remand, therefore, the district court must consider whether plaintiffs have satisfied the other two factors that it has not yet considered. If both these factors weigh heavily in plaintiffs' favor, the district court should proceed to consider whether plaintiffs' claims "are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." Davis, 302 F.3d at 1111. If these two factors have not been satisfied, the district court should proceed under the alternate standard, considering both NEPA and CWA claims under the applicable standard relevant to each.

## IV

The judgment of the district court is **REVERSED**, and the case **REMANDED** for proceedings consistent with this opinion.

---

[12](...continued)
project may be accomplished without "access or proximity" to a "special aquatic site, . . . practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise." § 230.10(a)(3). Thus, under the CWA, it is not sufficient for the Corps to consider a range of alternatives to the proposed project: the Corps must rebut the presumption that there are practicable alternatives with less adverse environmental impact. For example, the impact of the proposed bendway weirs must be evaluated under the CWA. On remand, the district court should carefully examine plaintiffs' claims under both NEPA and the CWA, taking into consideration the different standards pertinent to each statute.